NATIONAL FEDERATION OF FEDER-
AL EMPLOYEES, National Federation
of Federal Employees-Local 2058, and
Charles W. Jackson, Plaintiffs,

v.

Caspar W. WEINBERGER, John O.
Marsh, Jr., and Ronald P.
Cypher, Defendants.

Civ. A. No. 86–0681.

United States District Court,
District of Columbia.

June 23, 1986.

Bruce Happen, Clinton Wolcott, H. Ste-
phen Gordon, Staff Attys., National Feder-
ation of Fed. Employees, Washington, D.C.,
for plaintiffs.

Jeffrey S. Paulsen, Robert Chestnut,
David White, Department of Justice, Civ.
Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION
AND ORDER

THOMAS F. HOGAN, District Judge.

The plaintiffs, led by the National Feder-
ation of Federal Employees ("NFFE"),
have applied to this Court for a preliminary
injunction, which would forbid the defend-
ants from implementing a drug abuse test-
ing program. The proposed program
would require mandatory, random, and pe-
riodic urinalyses of federal civilian employ-
ees who work for the Department of the
Army in "critical" job categories. In addi-
tion, NFFE seeks to enjoin the distribution
to union members of DA Form 5019–R.
The defendants characterize this document

as a urinalysis consent form, the signing of which will constitute a condition for continued civilian employment with the Army.

The defendants are Secretary of Defense Caspar W. Weinberger, Secretary of the Army John O. Marsh, Jr., and Colonel Ronald P. Cypher, Commanding Officer of the Army facility known as Installation Support Activity, Aberdeen Proving Ground, Maryland ("Aberdeen"). Cypher will be responsible for administering the proposed drug testing program to the 190–200 members of NFFE's Local 2058 (a named plaintiff in this action) who work currently as security guards at Aberdeen.[1] Plaintiff Charles W. Jackson is President of Local 2058. Local 2058 members will not be subjected to testing until mid-July 1986. Members of other NFFE Locals may, however, be tested as early as June 24, 1986.[2]

Under *WMATC v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977), and *Virginia Petroleum Jobbers Association v. F.P.C.*, 259 F.2d 921, 925 (D.C.Cir.1958), plaintiffs argue that this case satisfies the traditional four-part test for a preliminary injunction. In regard to the likelihood of success on the merits, the plaintiffs claim that the Army's proposed program, which calls for drug testing where there is neither probable cause nor reasonable suspicion of drug use, violates the rights of federal employees to be protected from unreasonable searches and seizures under the Fourth Amendment, to due process under the Fifth Amendment, and to the pnumbral right of privacy under several amendments of the United States Constitution.

In addition, the plaintiffs charge that the program is violative of numerous federal statutory provisions. First, plaintiffs claim that it violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.*, because it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law ...," "contrary to constitutional right ...," and "in excess of statutory jurisdiction, authority or limitation...." *See* 5 U.S.C. § 706(2)(A)–(C). Second, the plaintiffs contend that the program is contrary to the mandate of 42 U.S.C. § 290ee–1, which prohibits the federal government from denying or depriving federal civilian employment "solely" on the basis of prior drug use. Third, the plaintiffs argue that the intended program violates 5 U.S.C. § 2301(b)(2), which provides that "all employees for employment should receive fair and equitable treatment ... with *proper regard for their privacy and constitutional rights....*" (Emphasis added.) Fourth, plaintiffs assert that the program violates 5 U.S.C. § 2302(b)(10), which forbids the recommendation of agency personnel action (*e.g.*, employee discharge) that "discriminate[s] for or against any employee or applicant for employment on the basis of conduct which does not *adversely affect the performance of the*

---

**1.** These Local 2058 members are attached to the "Civilian Guard Division" at the Aberdeen facility:

The mission of the Civilian Guard Division is to provide for the physical security of persons, property, material, and classified information located at Aberdeen Proving Ground and its tenant activities. The missions of the installation and its tenants include: research and development in chemical and conventional weapons systems; test and evaluation of weapons systems; quality assurance of conventional munitions; research, development, test and evaluation of experimental munitions; test and evaluation of foreign weapons systems; and other special studies. Protection is provided by the Civilian Guard Division against loss, theft, fire, espionage, acts of terrorism, sabotage, and natural disasters. Aberdeen Proving Ground is approximately

70,000 acres and employs over 9,000 civilian employees and 6,000 military personnel. Facilities include firing ranges, a nuclear reactor, test courses, chemical laboratories, classrooms, biological laboratories, ballistics laboratories, chemical agent storage facilities, munitions storage facilities, arms rooms, automatic data processing facilities, etc. Stored at the installation or in transit are chemical, experimental, depleted uranium; foreign and conventional munitions; small arms; complete weapons systems; experimental vehicles; armor; as well as numerous classified documents.

[Declaration of John D. Kammerer, Chief, Civilian Ground Division, Aberdeen Proving Ground, Maryland, ¶ 4.]

**2.** NFFE represents some 150,000 federal employees nationally.

*employee or applicant or the performance of others.*" (Emphasis added.) Finally, the plaintiffs challenge the program under 5 U.S.C. § 7513(a) (a provision related to § 2302(b)(10)), which permits agency action "against an employee *only for such cause as will promote the efficiency of the service.*" (Emphasis added.)

The plaintiffs cite *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), for the proposition that "[t]he imminent denial of constitutional rights clearly constitutes irreparable injury." Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction ("*Prelim. Inj. Motion*"), at 30. Plaintiffs maintain that they will soon be subjected to random, unconstitutional drug testing, and be required to divulge private information regarding their individual medical conditions and use of prescription drugs. *Id.*

Plaintiffs argue additionally that the defendants will not be harmed by a delay in the implementation of the testing program, because the Department of Defense "has admitted that there is no significant problem with drug abuse among civilian employees." *Id.* at 31.

Finally, the plaintiffs declare that injunctive relief would be in the public interest. *Id.* at 32. "The right of citizens to be protected from unreasonable search and seizure is a capital component of our constitutional system." *Id.*

The defendants have moved to dismiss the complaint, under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. They argue that this Court is precluded from reviewing plaintiffs' claims, because this action involves a "labor-management" dispute, and is therefore governed by the exclusive jurisdictional framework of the Civil Service Reform Act ("the CSRA"). In particular, the defendants contend that plaintiffs' claims belong before either the Federal Labor Relations Authority ("the FLRA") or the Merit Systems Protection Board ("the MSPB"). In addition, the government maintains that the drug program at issue constitutes an

agency action that is "committed to agency discretion by law" under the Administrative Procedure Act ("APA"), so that judicial review of the program is not available.

The defendants have also opposed plaintiffs' application for a preliminary injunction, arguing that this case meets none of the criteria for such relief.

The parties have supplied the Court with copious briefs, affidavits, and exhibits with respect to both the motion to dismiss and the preliminary injunction application. On May 22, 1986, the Court heard lengthy oral argument on both matters. After a thorough evaluation, the Court has concluded that the motion to dismiss shall be granted, and that the application for a preliminary injunction shall be denied.

## I. *The Challenged Drug Testing Program*

### A. *Department of Defense ("DOD") Directive 1010.9*

Directive 1010.9 was signed by Deputy Secretary of Defense William H. Taft, IV on April 8, 1985. It authorizes the establishment of "the DOD Civilian Employees Drug Abuse Testing Program." Under the Directive, personnel designated as "critical" are subject to the program. These personnel designations include the following:

(1) Law Enforcement.

(2) Positions involving the national security or the internal security of the Department of Defense in which drug abuse could cause disruption of operations, destruction of property, threats to the safety of personnel, or the potential for unwarranted disclosure of classified information.

(3) Jobs involving protection of property or persons from harm.

*Id.*, ¶ F1c(1)–(3). *See supra* note 1 (duties and responsibilities of security guards at Aberdeen facility).

Paragraph D of the Directive articulates the purpose of the testing program as follows:

It is DOD policy that DOD Components *may establish* a drug abuse testing program for *civilian employees in critical jobs* to:

1. Assist in determining fitness for appointment to, or retention in a critical job.

2. Identify drug abusers and notify them of the availability of appropriate counseling, referral, rehabilitation, or other medical treatment.

3. Assist in maintaining the national security and the internal security of the Department of Defense by identifying persons whose drug abuse could cause disruption of operations, destruction of property, threats to the safety of themselves and others, or the potential for unwarranted disclosure of classified information through drug-related blackmail.

(Emphasis added.)

Employees in (or "applicants" for) critical jobs "may be" required to participate in urinalysis testing in the following circumstances:

(1) Before appointment or selection.

(2) *Periodically after appointment or selection on the basis of neutral criteria.*

(3) When there is probable cause to believe that an employee is under the influence of a controlled substance while on duty.

(4) In an examination authorized by the Department of Defense or the DOD Component regarding a mishap or safety investigation undertaken for the purpose of accident analysis and the development of countermeasures.

*Id.* ¶ F2a ("*Guidelines for Use of Urinalysis*") (emphasis added). *But see infra* Part IB (Army plan permits "random" testing).

The civilian program calls for two levels of testing: "field testing" and "confirmation testing." Field tests of urine samples are conducted first. *Id.,* ¶ F4. The results of such preliminary tests must be immediately sent to a laboratory for "certifica-

tion." *Id.,* ¶ F4b. "Chain of Custody" procedures for urinalysis testing are to be set forth by each DOD Component (*e.g.,* the Department of the Army) implementing the program. *Id.,* ¶ F3. Positive field tests "are preliminary results until confirmed as positive ... or by an admission of the employee." *Id.,* ¶ F4b(1). Until a field test is confirmed or admission by the employee is obtained, such preliminary results *"may be used for temporary referral to a civilian employee [drug] assistance program, temporary detail to other duties or administrative leave, or temporary suspension of access to classified information." Id.,* ¶ F4b(2) (emphasis added).

If a positive field test is not confirmed or admitted by the employee, the results "may not be used to take further action against the employee," and any temporary action taken *"based upon the field test shall be rescinded." Id.,* ¶ F4c(1) & (2) (emphasis added). However, if a temporary action is taken on the basis of both a positive field test and "evidence other than the field test result," the temporary action may be continued, or "other appropriate action" taken. *Id.,* ¶ F4. Otherwise, *"[t]he [unconfirmed] results of field tests may not be used in administrative or disciplinary proceedings....." Id.,* ¶ F2e (emphasis added).

More importantly, Paragraph F2d of the Directive provides as follows:

An employee whose urinalysis is *confirmed positive shall be offered counseling or treatment,* or both, through the local assistance program in accordance with the Federal Personnel Manual Supplement (reference (c)), *if qualified. Nothing in this provision precludes the use of a confirmed positive urinalysis result in an authorized adverse action proceeding* or for other appropriate purposes, except as otherwise limited by rules issued by the DOD Component concerned.

(Emphasis added.) The record before the Court does not indicate the criteria used to determine whether a civilian employee is "qualified" for the local assistance program. Where military personnel are con-

cerned it appears, under Army Regulation ("AR") 600–85, Interim Change No. I04, that "[s]ervice members identified as alcohol and illegal drug abusers, who, *in the opinion of their commander warrant retention will be afforded the opportunity for rehabilitation. Those service members identified as alcohol or other drug abusers who do not warrant retention will be processed for separation from the military.* " [Defendants' Exhibit D (emphasis added)] It is not clear whether civilian employees would be subject to similar evaluations by their supervisors before being designated "qualified" and therefore eligible for drug treatment. *See infra* Part IB (AR 600–85, Interim Change No. Ill, Page 5–14 C(3)(b) & (4) provide that current civilian employees whose field tests are confirmed as positive or admitted may be subject to adverse proceedings or offered counseling and treatment, *"if eligible"*) (emphasis added).

B. *Army Regulation 600–85, Interim Change No. Ill*

This Interim Change was intended to implement Directive 1010.9, *supra*, Part IA, so that federal civilian employees assigned to "critical" jobs with the Department of the Army would be subject to the "DOD Civilian Employees Drug Abuse Testing Program." Interim Change No. Ill. The Interim Change's policy statement is identical to the three-point policy statement of Directive 1010.9. *See supra*, Part IA. Members of plaintiff Local 2058 are subject to the Army's testing program, under any one of three personnel categories designated as "critical," as made clear by Page 5–14b(1)–(3) of the Interim Change:

(1) Law enforcement.

(2) Positions involving national security or the internal security of the Army at a level of responsibility in which drug abuse could cause disruption of operations or the disclosure of classi-fied information that could result in serious impairment of national defense.

(3) Jobs involving the protection of property or persons from harm, or those where drug abuse could lead to threats to the safety of personnel.

These designations parallel closely the critical personnel designations in Directive 1010.9. *See supra* Part IA. *See also* note 1 (duties and responsibilities . of security guards at Aberdeen facility).

Critical employees must be given ninety (90) days notice before their initial urinalyses. Interim Change No. Ill, Page 5–14e(2). Thereafter, as prescribed by Directive 1010.9, *supra*, the Army's System has two levels of testing: field and confirmation testing. However, whereas the Directive provided for field testing "periodically ... on the basis of *neutral criteria,* " *see id.* ¶ F2a(2) (emphasis added), *supra* Part IA, the Army's implementation plan calls for urinalyses that may be required *"[p]eriodically ... on a random basis."* Interim Change No. Ill, page 5–14e(1)(b) (emphasis added). More specifically,

[t]he decision to require an individual covered by the biochemical testing program to undergo such testing to detect drug abuse is the *commander's prerogative....* Beyond the pre-accession test for civilian employees in critical positions, subsequent testing is *left to the commander's discretion.*

*Id.* Page 5–14f(7) (emphasis added).[3]

In accordance with Paragraph F3 of Directive 1010.9, *see supra* Part IA, the implementation plan of the Army (a "DOD Component") calls for *"strict* chain of custody procedures" for all urine samples taken of civilian employees. Interim Change No. Ill, page 5–14f(1). Although the exhibits filed do not delineate these procedures, it is clear from the briefs filed and argument heard that field tests are to be direct-

---

**3.** In their reply brief and during oral argument, the defendants stated that the Army's administration of field tests would *not* be discretionary or random. "The persons to be tested during any given time period will be chosen in a *neutral and nondiscretionary manner,* such as all employees whose birthday falls in a particular month." Defendants' Reply to Plaintiffs' Opposition to Motion to Dismiss (*"Defendant's Reply"*), at 32 (emphasis added).

ly observed at laboratories by supervisory personnel of the same sex as the employees tested. *See id.* Page 5–14f(5).

Positive field tests of current employees are "preliminary results until confirmed as positive by ... confirmation testing or by an admission by the employee." *Id.* Page 5–14f(5)(a). As was the case under Directive 1010.9, *supra,* positive field tests of current employees may only be used for "temporary referral to a civilian employee assistance program, temporary detail to other non-critical duties or administrative leave, or temporary suspension of access to classified information." *Id.* Page 5–14f(5)(b). *See supra* Part IA.

Again, if a positive field test is not confirmed by a certified laboratory or by the admission of an employee, the preliminary result may not be used to take further action against the employee, and "any temporary action must be rescinded." *Id.* Page 5–14f(5)(c). *See* Directive 1010.9 ¶ Fc(1) & (2); *supra* Part IA. And, as prescribed in Paragraph F2d of the Directive, *supra* Part IA,

> [a]n employee whose urinalysis has been confirmed as positive shall, *if eligible,* be offered counseling or treatment through the local employee assistance program in accordance with the Federal Personnel Manual Supplement 792–2.... Nothing in this provision precludes the use of a confirmed positive urinalysis result in an authorized *adverse action* proceeding or for other appropriate purposes, except as otherwise limited by rules issued by the Department of the Army.

Interim Change No. Ill, Page 5–14e(4). The record before the Court, once again, does not indicate the criteria used to determine whether a civilian employee is "eligible" for the local assistance program. *See supra* Part IA (DOD Directive fails to indicate personnel "qualified" for rehabilitation program); [Defendants' Exhibit D (service members eligible for alcohol and drug abuse treatment program if commanding officers determine members "warrant retention") ]

Finally, the Interim Change states that the drug testing program is *"not negotiable* with recognized labor organizations because it involves the Army's *internal security practice* within the meaning of 5 U.S.C. § 7106(a)(1)." *Id.,* Page 5–14g. *See infra* Part IIA & B (defendants argue for non-reviewability of program).

## C. *"EMIT" Field Testing and Subsequent Confirmation Testing*

The Army has chosen the Enzyme Multiplied Immunoassay Technique ("EMIT") System, marketed by Syva Company, for the field testing stage of its program. The EMIT test consists of antibodies that attach themselves to drugs or drug metabolites (which are products resulting from the breakdown of drugs by the body) in an individual's urine sample. Syva/a Syntex Company, Frequently Asked Questions About Syva and Drug Abuse Testing (*"EMIT Questions"*) (March 1983), p. 3.

The field test does not measure the amount of a drug present (concentration) in an individual's system; nor does it determine when a drug was used. It provides either a negative or positive result. If a result is negative, this indicates either that no drug is present in the sample or that a drug level in the sample is indetectably low. *Id.* at 4. A positive result indicates only that the drug in question is present in the urine sample at a detectable level. *Id.*

Depending on the dose taken, most drugs can be detected in urine sample by the EMIT system for up to three days after they have been taken. *Id.* Marijuana may, however, be detected for as long as two to three weeks. *Id.* Amphetamines and secobarbital pass through the body so quickly that the EMIT System may not detect recent use of these drugs. *Id.* EMIT can also be used to test for barbiturates, cocaine, opiates, methaqualone, and menzodiazepines. Declaration of Lieutenant Colonel John S. Jewell (Ph.D.) (*"Jewell Decl."*), p. 4. [Defendants' Exhibit E] The EMIT test is accurate for 97 to 99% of samples tested, although Syva, the manufacturer, represents conservatively that the test is accu-

rate 95% of the time. *EMIT Questions*, p. 5.

If a urine sample tests positive for the presence of a drug, supervisory personnel will conduct a "gas chromatography/mass spectrometry," ("GC/MS") test to confirm the field test's result. *Jewell Decl.*, p. 5. This procedure separates the actual drug or drug metabolites from the tested individual's urine matrix. *Id.* The GC/MS procedure has been recognized as the "state-of-the-art method" of confirmation, and has been accepted by the scientific community as being the most reliable and acceptable method for drug and drug metabolite identification. *Id.* Once an EMIT test's positive result is verified by a positive GC/MS test, an employee's field test is "confirmed" for purposes of AR 600–85, Interim Change No. Ill. *Motion to Dismiss*, at 6 n. 3.

### D. *DA Form 5019–R: Condition of Employment*

Form 5019–R is entitled "Condition of Employment for Certain Civilian Positions Identified as Critical under the Drug Abuse Testing Program." It is divided into two parts. Part A provides as follows:

> As a prospective or current employee in a position designated by the Department of the Army and approved by the Office of the Secretary of Defense as critical to national or internal security or to the protection of persons or property, *you are required to read and sign this statement as a condition of employment.* If you are an applicant for a critical job and fail to sign this agreement, you will not be selected for the position. If you are currently in a critical job and refuse to sign the condition of employment, you will be voluntarily or involuntarily reassigned or demoted to a noncritical job or separated from Federal employment. *If you sign the condition of employment and later refuse to submit to urinalysis testing, you will be non-selected, reassigned, demoted, or separated* according to applicable regulations. To verify that you are not currently using drugs, *you will be required, as a condition of your continued employment, to submit a urine sample for testing purposes: (1) periodically, on an unannounced basis,* (2) when there is probable cause to believe that you are under the influence of drugs, and/or (3) when there is a mishap or safety investigation being conducted in relation to an accident involving government-owned vehicles, aircraft, or equipment. *To assure the validity of these tests, a staff member of the same sex will observe you while you are providing the sample. Detection of drug usage through confirmed positive urinalysis test results may be cause for a determination that you have failed to meet the conditions necessary for your continued employment in the position.* Medically prescribed drugs authorized by a physician and confirmed by appropriate evidence are excluded from such determinations. The results of urinalysis will be used only for clinical and necessary administrative purposes. You are entitled to any additional and reasonable information or clarification you desire prior to signing the agreement. A copy of the signed agreement will be given to you and your supervisor. The original will be placed in your Official Personnel Folder.

(Emphasis added.)

Part B, entitled "Agreement," provides the following: "This is to certify that I understand the contents of the policy described above and the reasons therefor, and that *I agree to adhere to the terms of this policy as a continuing condition of my employment* in positions to which this agreement applies." (Emphasis added.) Beneath Part B, a space entitled "Signature of Employee/Applicant" is provided.

## II. *Motion to Dismiss*

### A. *Civil Service Reform Act: Exclusive Jurisdiction*

On March 7, 1986 a representative of the civilian personnel office at Aberdeen provided a Local 2058 representative with a copy of AR 600–85, Interim Change No. Ill. On March 19, plaintiff Jackson, President

of Local 2058, responded to the proposed regulation, by writing to defendant Colonel Cypher and expressing the union's desire "to conduct negotiations" regarding the implementation of the Alcohol and Drug Abuse Prevention and Control Program. [Defendants' Exhibit H] Two days later, Local 2058 submitted the following proposals for negotiation:

a. THE RANDOM TESTING WILL BE PACED IN SUCH A WAY AS TO PROVIDE FOR A NO GREATER THE [sic] ONE (1) PERCENT NON–PRODUCTIVE EMPLOYEE RATE, THEREFORE NEITHER JEOPARDIZING THE DIVISIONS SECURITY POSTURE, CURTAILING LEAVE ADMINISTRATION OR [sic] EXCESSIVELY INCREASING WORK LOAD.

b. A COMPUTER PROGRAMED FOR RANDOM SELECTION OF THE ENTIRE BARGAINING UNIT WILL BE BY A DISINTERESTED INDIVIDUAL AND MONITORED BY UNION REPRESENTATION.

c. EVERY EFFORT WILL BE MADE TO INSURE PROPER CHAIN OF CUSTODY OF ALL SAMPLES. AT A MINIMUM THE SAMPLE WILL BE DIVIDED FOR THE PURPOSE OF THE EMPLOYER TO RETAIN HIS OR HER PORTION WITH INSTRUCTIONS FOR PROPER STORAGE PROVIDED. IN THE EVENT OF A CONFIRMED POSITIVE THE EMPLOYEE'S RETAINED PORTION WILL BE CONFIRMATORY TESTED. BOTH CONFIRMATORY TESTS MUST MATCH BEFORE PROPOSING ADVERSE ACTION AGAINST THE EMPLOYEE.

d. IN THE EVENT THE EMPLOYEE TEST "FIELD POSITIVE" ("FIELD POSITIVE" BEING 100NG/ML OF METABOLITIES [sic] OF THC OR GREATER) THE EMPLOYER WILL ADMINISTER TWO (2) ADDITIONAL FIELD TESTS SPACED AT LEAST TWENTY–FOUR (24) HOURS APART. ALL THREE FIELD TESTS MUST TEST POSITIVE BEFORE ANY ADMINISTRATIVE ACTION IS TAKEN INVOLVING EMPLOYEE'S SECURITY CLEARANCE.

e. DURING ALL TESTING AND PROCESSING OF SAMPLES, EMPLOYEES WILL REMAIN ON HIS/HER REGULAR SHIFT WITH NO LOSS OF PAY SUFFERED.

[Defendants' Exhibit I] Thus, the plaintiffs did not originally object to drug testing per se, but rather viewed the proposed testing program as a "negotiable" labor-management subject involving possible unfair labor practices. On this basis, the defendants argue that the issues raised in this case are governed by the exclusive jurisdictional provisions of the CSRA. *Motion to Dismiss*, at 10. Therefore, the defendants have moved for dismissal under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

According to the Army, the testing program, as effected by DA Form 5019–R, constitutes a new "condition of employment." *Id.* at 11. *See* 5 U.S.C. §§ 7102(2) & 7104. It is the defendants' position that the plaintiffs must, therefore, attempt to characterize the program as a "negotiable" employment practice with the FLRA, and raise their labor practice challenges to the program before that administrative tribunal. *Id.* at 14. In addition, the defendants contend that plaintiffs' constitutional and statutory challenges to the program will eventually receive Article III review, because the plaintiffs are entitled to appeal any final FLRA decision to the appropriate Circuit Court of Appeals. *Id.* at 10.

In addition to establishing the FLRA framework for resolving labor relations disputes, the defendants argue that the CSRA sets out the "exclusive comprehensive process for resolving personnel claims of federal employees" in the MSPB scheme. *Defendants' Reply*, at 10. The Army contends that if an employee, subjected to drug testing, is demoted or suffers any other "adverse action," *see* 5 U.S.C. § 7512, he may appeal that agency

decision to the MSPB. *Id.* Employees may also seek review of non-adverse actions (*e.g.,* transfers and reassignments) by "petitioning the Special Counsel of the MSPB to investigate allegations of prohibited personnel practices. The Special Counsel may investigate these allegations and ask the MSPB to consider and order corrective action in the matter. *Id.* n. 5. *See* 5 U.S.C. § 1206(a)-(c). In addition, the defendants argue, the Special Counsel may seek a stay of the challenged personnel action through a union grievance proceeding. *Id.* n. 6.

Therefore, the defendants conclude, the MSPB alone may hear the type of personnel challenges the plaintiffs have presented to this Court in regard to the testing program—*i.e.,* the lack of a nexus between an employee's off-duty drug use and on-duty job performance. *Id.* at 10. Under 5 U.S.C. § 1205, the Army maintains, "[t]he MSPB will conduct a fact-specific inquiry (with hearings, witnesses, and document production) into both the conduct that precipitated the adverse action and its effect upon the agency's mission to determine whether the nexus to justify the adverse action exists." *Id. See* 5 U.S.C. § 2302(b)(10) (agency may not discriminate against employee on basis of off-duty conduct "which does not adversely affect" employee's job performance); 5 U.S.C. § 7513 (agency may take action against employee only for "such cause as will promote the efficiency of the service.") More importantly, as expressed by the defendants, MSPB remedies are exclusive, even where an employee alleges the violation of a fundamental constitutional right. *Defendants' Reply,* at 17. Finally, the Army points out that an aggrieved Federal employee may appeal an adverse MSPB decision to the Court of Appeals for the Federal Circuit, so that his constitutional and statutory claims will eventually receive judicial review. *See* 5 U.S.C. § 7703.

Reluctantly, after careful analysis of the pertinent case law, the Court has untied this subject matter Gordian knot in favor of the Army. It appears that the plaintiffs must pursue their constitutional and statu-tory challenges to the drug abuse testing program within the administrative framework of the CSRA and not in this forum.

As enunciated by the United States Supreme Court in *Bush v. Lucas,* 462 U.S. 367, 385, 103 S.Ct. 2404, 2415, 76 L.Ed.2d 648 (1983), "[f]ederal civil servants are now protected by an elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures—administrative and judicial—by which improper action may be redressed." Within this scheme, constitutional challenges to agency action, "are *fully cognizable....*" *Id.* at 386 (emphasis added). Thus, where "the ultimate question on the merits ... [of a] case may be appropriately characterized as one of 'federal personnel policy,'" *id.* at 380, and the CSRA's "elaborate remedial system" will protect the constitutional and statutory interests at issue, a plaintiff must pursue challenges to agency action within that system. *See id.* at 388.

The crux of the case before the Court is the Army's drug abuse testing program. As demonstrated by Local 2058's initial response to AR 600-85, Interim Change, No. Ill, *supra,* the ultimate question on the merits concerns a labor-management dispute—*i.e.,* an issue of federal personnel policy. Accordingly, unless the CSRA's remedial framework will not provide adequate review of the plaintiffs' constitutional and statutory concerns about the program, this Court lacks jurisdiction to rule on the merits of the union's case. Although not without concern over the serious issues presented, the Court concludes, on the basis of the record before it, that the FLRA and MSPB will eventually afford plaintiffs sufficient judicial review of their substantial challenges to the testing program, so that the complaint must be dismissed.

To begin with, there is a potential "Catch–22" in the defendants' FLRA argument. The Army has represented to the Court, both in their briefs and during oral argument, that the testing program is a

non-negotiable condition of employment, because it involves the Army's internal security practices within the meaning of 5 U.S.C. § 7106(a)(1).[4] *Defendants' Reply*, at 6. *See infra* Part IIB (defendants contend successfully that District Court may not conduct APA review of plaintiffs' action because "internal security practices" under 5 U.S.C. § 7106(a)(1) are "committed to agency discretion by law.") Moreover, AR 600–85, Interim Change No. Ill, Page 5–14g states expressly that the drug testing program is "not negotiable with recognized labor organizations because it involves the Army's internal security practices within the meaning of 5 U.S.C. § 7106(a)(1)." *See supra* Part IB. Obviously, if the plaintiffs seek FLRA evaluation of the testing program, the Army will continue to take the position that the program is not negotiable.[5]

Furthermore, under 5 U.S.C. § 7123(c), judicial review of a final FLRA order, such as a finding of non-negotiability, by the appropriate United States Court of Appeals "shall be on the record." Therefore, "[n]o objection that has not been *urged* before the [FLRA] ... shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances." (Emphasis added.) *See EEOC v. FLRA*, —— U.S. ——, ——, 106 S.Ct. 1678, 1680, 90 L.Ed.2d 19 (1986) (Court of Appeals without jurisdiction to

consider issue not "urged" before FLRA). The plaintiffs asserted vehemently during oral argument that if they were routed to the FLRA and that body affirmed the Army's non-negotiability characterization, the constitutional and statutory challenges to the Army's program may never receive adequate judicial review, because the Court of Appeals would have no "record" to evaluate.[6]

With respect to the MSPB avenue of relief, the plaintiffs' concern, expressed during oral argument, that possible constitutional and statutory violations would only be addressed on a case-by-case, ex post facto basis, is shared by the Court. The union asserts correctly that Article III courts are generally better equipped to evaluate the constitutionality and/or legality of government action than are administrative agencies.

Nonetheless, the plaintiffs have failed to identify sufficient precedent to justify resolution of the application for a preliminary injunction or non-dismissal of the complaint by this Court in light of the sweeping policy concerns of *Bush, supra.* In *Keefe v. Library of Congress*, 588 F.Supp. 778, 786 (D.D.C.1984), *aff'd*, 777 F.2d 1573 (D.C.Cir. 1985), a federal employee of the *legislative* branch was permitted to pursue her "First Amendment claim directly in ... [District] Court, since the claim ... [was] a constitutional one susceptible of immediate disposi-

**4.** 5 U.S.C. § 7106(a)(1) provides in pertinent part as follows: "[N]othing in this chapter ... [Labor-Management Relations] shall affect the authority of ... any agency—(1) *to determine* the missions, budget, organization, number of employees, and *internal security practices* of the agency...." (Emphasis added.)

**5.** Moreover, an investigation by the Court of several FLRA decisions reveals that when a government agency characterizes as non-negotiable a plan that implicates search and seizure interests, the FLRA normally affirms this characterization. *See, e.g., National Ass'n of Gov't Employees, SEIV, AFL–CIO*, 16 F.L.R.A. No. 57 (1984) (agency's internal security practices include right to determine policies and actions to secure or safeguard physical property "against internal and external risks"; Air Force permitted to conduct unannounced searches of civilian commissary employees absent "reasonable suffi-

cient grounds" to believe theft has occurred); *Nat'l Treasury Employees Union*, 16 F.L.R.A. No. 54 (1985) (Dep't of Treasury permitted to implement internal security practice requiring employees to be searched, when necessary, to prevent removal of tools used to make currency, stamps, etc.); *Federal Employees' Metal Trades Council*, 12 F.L.R.A. No. 78 (1983) (Navy internal security practice of searching civilian employees for hand-held items outside duty to bargain).

**6.** Although NFFE's Local 2058 is not presently pursuing an administrative attack on the testing program with the FLRA, Local 15 of the same union has taken this route. In that administrative action, the Army has taken the position that the testing program is not negotiable. Plaintiff NFFE, the national organization, has been designated as Local 15's representative in any further actions before the FLRA.

tion on summary judgment, and *require[d] an analysis wholly outside the expertise of the CSRA's decisionmakers.*" However, *Keefe* made clear that because the plaintiff was not an employee of the *executive* branch of the federal government, she did not have available to her "the CSRA's statutory appeals procedure culminating in the MSPB." 588 F.Supp. at 786. Therefore, she could not have processed her constitutional claim through the CSRA and obtained subsequent judicial review by the Federal Circuit. *Id.* at 787. In the present case, the plaintiffs are executive agency employees; thus, they do have available the administrative procedures of the CSRA.[7] Therefore, *Keefe* does not help them.

In *Borrell v. United States International Communications Agency*, a panel of this Circuit permitted a federal executive employee to bring her constitutional claim in district court, despite the fact that she was an executive agency employee. 682 F.2d 981, 990 (D.C.Cir.1982). However, the *Borrell* panel made clear that because the plaintiff was only a "probationary employee," she would have had "no appeal to the MSPB or to a judicial forum at all from an adverse personnel action...." *Id.* Therefore, the Court concluded that the plaintiff, who alleged she had been discharged in retaliation for "whistleblowing," was permitted to bring her First Amendment claim directly before an Article III court. Again, the plaintiffs in the present case have full CSRA protections and procedures available to them—none of the Aberdeen employees is a probationary employee, and NFFE's Local 15 is already taking action before the FLRA. *See supra* note 6. *See also Wil-*

*liams v. IRS*, 745 F.2d 702, 705 (D.C.Cir. 1984) (per curiam) (plaintiff entitled to bring First Amendment claim directly in district court if he has "no CSRA-conferred guarantee of an administrative adjudication ... or of direct court review").[8]

The plaintiffs come closest to establishing the jurisdiction of this Court over their constitutional and statutory violations claims in *Andrade v. Lauer*, 729 F.2d 1475 (D.C.Cir.1984). In *Andrade*, Judge Wright of this Circuit held that the plaintiffs were not required to bring their "*non*-constitutional claims through grievance channels before bringing their constitutional claim in federal court." (Emphasis in original.) *Id.* at 1491. He wrote also that "[j]udicial proceedings on the constitutional claim would not forfeit the benefit of agency expertise." *Id.* Nonetheless, Judge Wright made clear that the plaintiffs could not have brought their constitutional claim in the hybrid contractual/statutory grievance procedure agreed to by the plaintiff employees and their federal employer, the Office of Juvenile Justice and Delinquency Prevention. *Id.* Moreover, "neither party argue[d] that the grievance procedure ... [was] an adequate forum to resolve the constitutional claim." *Id.* Furthermore, in *Andrade*, the personnel action challenged by the plaintiffs was a reduction in force ("RIF"), whereas the constitutional claim pressed by them was a completely *unrelated* charge, under the Appointments Clause of the Constitution, Art. II, § 2, cl. 2, that the officials who planned and executed the RIF had not been appointed by the President nor confirmed by the Senate. *Id.* at 1480.[9]

---

**7.** Local 15 of NFFE is currently challenging the drug testing program before the FLRA. *See supra* note 6.

**8.** *But see Cutts v. Fowler*, 692 F.2d 138, 140 (D.C.Cir.1982). In *Cutts*, a panel of this Circuit stated "*that the existence of CSRA procedures does not affect the jurisdiction of the district courts to hear constitutional claims on personnel practices.*" (Emphasis added.) This language is, however, deceivingly broad. In *Cutts*, the court held specifically that, in regard to the federal employees' constitutional claim, "*Borrell*

controls the jurisdictional dimension of this issue." *Id.* (footnote omitted). It is, therefore, evident that the *Cutts* panel was limiting direct access to district courts of constitutional claims that could *not* have been addressed in CSRA proceedings as was the case in *Borrell.*

**9.** This distinction in *Andrade* is consonant with Judge Wald's opinion in *Krodel v. Young*, 748 F.2d 701 (D.C.Cir.1984). In *Krodel*, the court held that a federal employee, who enjoyed *pre-*CSRA remedies against the federal government could bring his age discrimination claim direct-

■ These cases stand for the proposition that, if a federal employee is subject to the CSRA, and has available to him the remedial procedures provided for therein, he must pursue his constitutional and statutory challenges to agency action before the appropriate administrative tribunal— *i.e.*, the FLRA or MSPB—before he is entitled to judicial review of these claims. Although an employee has alleged constitutional claims in district court, he is precluded from having them heard there "for so long as effective remediation *conceivably* could have been achieved through the administrative process." *Daly v. Costle*, 661 F.2d 959, 963 (D.C.Cir.1981).[10] This presumes, of course, that the constitutional or statutory violation claim at issue is not completely divergent from the agency personnel action complained of. *See supra* note 9 and accompanying text.

■ In the action before the Court, the union has not adequately demonstrated that resort to the FLRA and MSPB procedures for resolution of their constitutional and statutory claims would be "futile," nor have they demonstrated hurdles so high as to make the available CSRA scheme extremely burdensome or likely to delay judicial resolution for an "extremely long time." *Andrade*, 729 F.2d at 1493. Further, the union has shown, by virtue of the "conditions of employment" approach it took initially in response to AR 600–85, Interim Change No. Ill, *see supra* p. 18, that the constitutional and statutory claims in question arise out of the employee-employer relationship its members share with the Department of the Army: in short, they arise out of a labor dispute. *See Wells v. FAA*, 755 F.2d 804, 810 (11th Cir.1985) (where "relationship between the Federal government agency supervisors and other Civil Service employees is a 'special factor,'" and plaintiff has available "various administrative forums" in which to assert claims, district court may not entertain Fifth Amendment claim).

As made clear by the Eighth Circuit in *Carter v. Kurzejeski*, any constitutional aspects of the plaintiffs' claims *"will not escape judicial scrutiny ...* under the procedures mandated by Civil Service Reform Act." 706 F.2d 835, 841 (8th Cir.1983). The FLRA provides for "indirect review in the courts of appeals of decisions of the panel if they form the basis of a final order by the FLRA in unfair labor practice proceedings." *Council of Prison Locals v. Howlett*, 562 F.Supp. 849, 851 (D.D.C.1983) (footnote omitted). "In the absence of one of the few recognized statutory or judicial exceptions, that scheme is exclusive." *Id.* As demonstrated by the actions taken by NFFE's Local 15, *see supra* note 6, there is no "exception" available to excuse the national union and Local 2058 here from initiating proceedings before the FLRA. And, given the representations made by the defendants (both in their briefs and during oral argument) that the appropriate Court of Appeals will fully evaluate the plaintiffs' constitutional and statutory claims in the event the FLRA affirms the Army's "non-negotiable" characterization of the drug testing plan, it appears that effective judicial review is available, albeit later, to the plaintiffs. *See Defendants' Reply*, at 9 ("If the FLRA rules that the union proposal is a non-negotiable internal security matter, plaintiffs may appeal that decision to the Circuit Court of Appeals, and *raise all*

---

ly in district court, but could not append thereto a First Amendment claim "arising out of his employment relationship." *Id.* at 711 (discussing *Bush* ).

**10.** In *Daly*, the plaintiff was, however, permitted to bring her constitutional claims of political bias in district court against her supervisory officials "personally and individually." 661 F.2d at 963. These claims "were not redressable administratively." *Id.* In the present case, defendants Weinberger, Marsh, and Cypher are

sued solely in their "official capacit[ies]." *Complaint*, ¶¶ 6–8. Moreover, the plaintiffs make no allegations that the alleged constitutional and statutory violations are somehow "unrelated" to the drug testing program. *Contra Andrade*, 729 F.2d at 1492–93 ("almost complete divergence between constitutional and nonconstitutional claims renders irrelevant most of the purposes underlying the exhaustion requirement"). *See supra* note 9 and accompanying text.

*its legal challenges to the urinalysis program there"*) (emphasis added).

With respect to the MSPB procedures at issue, if an individual Aberdeen employee either refuses to be tested or tests positively for drug use in both field and confirmation tests, and the Army takes "adverse action" against him as that term is used in the CSRA, he may raise constitutional and statutory challenges to the testing program in MSPB proceedings. *See* 5 U.S.C. § 7703(b)(1).

In the context of the key statutory challenges raised by the plaintiffs, the MSPB would be better equipped to protect an employee's greatest concern—his job security—than this Court would be. In particular, the administrative tribunal would have the fact-finding capability and agency expertise to determine whether the Department of the Army had acted in accordance with 5 U.S.C. §§ 2302(b)(10) & 7513(a) in taking adverse action—*i.e.*, the Army would be required to demonstrate a nexus between either an employee's refusal to be tested or his positively tested off-duty drug use and his on-duty job performance.

If agency action is taken against a civilian employee that cannot be characterized within the framework of the CSRA as "adverse," so that the employee does not have an available avenue of relief to the MSPB, it appears that nothing would prevent the employee from bringing a *Bivens-* type action against the individuals who ordered or supervised his drug testing: in short, "effective remediation" for alleged constitutional deprivations could not "conceivably" be achieved through the administrative process. *Daly,* 661 F.2d at 963. *See also Keefe,* 588 F.Supp. at 786 (district court must entertain constitutional claim of federal employee where statutory scheme protecting federal employees provides no remedy); *Borrell,* 682 F.2d at 990 (district court must entertain constitutional claim where federal statutory scheme protecting federal employees provides no MSPB or judicial review of agency action); *Andrade,* 729 F.2d at 1491 (district court must entertain constitutional claim where claim can-

not be brought in grievance procedure agreed to by federal employer and employees under CSRA).

The same analysis would apply to an employee who tests *negatively* after submitting a urine sample under protest. As the plaintiffs correctly point out, "[t]he urinalysis itself is not an adverse action...." Plaintiffs' Response to Defendants' Reply to Opposition to Motion to Dismiss (*"Plaintiffs' Response"*), at 4. The union's concern about unredressed recurrence of possible Fourth Amendment violations is shared by the Court. *See id.* Again, however, because an employee who tested negatively would not be able to claim to the MSPB that he had been deprived of his constitutional rights (and would therefore have no eventual judicial review of such a claim available), nothing would preclude the bringing of a *Bivens-*type action against those personnel who ordered or administered the urinalysis in question. *See Reuben v. United States,* 750 F.2d 1039, 1056 (D.C.Cir.1984) ("in assessing a *Bivens* action, the Court must permit such an action unless Congress has already provided an equally effective remedy to redress the constitutional wrongs or unless special factors exist which taken together make the *Bivens* action inappropriate") (footnote omitted). Nonetheless, none of Local 2058's members have been ordered to submit to testing to date, so that a *Bivens-*type approach to the drug testing program is not ripe. *But cf. Bush,* 462 U.S. at 388–89, 103 S.Ct. at 2416–17 (district court may not entertain *Bivens* action for damages against federal management personnel for imposing discipline on employees where "elaborate remedial system" of CSRA provides avenue of relief).

The Court must therefore dismiss this action although the drug testing program, on its face, raises substantial Fourth Amendment concerns. Furthermore, the fact that the field testing stage of the program requires observed urinalysis makes the Court question the reasonableness of the intrusion into possible privacy expectations. However, the Court cannot

at this time consider these issues despite the alleged harm to the plaintiffs. *Cf. Hastings v. Judicial Conference of United States,* 770 F.2d 1093, 1102 (D.C.Cir.1985) (agencies entitled to measure of comity "sufficient to preclude disruptive injunctive relief by federal courts absent a showing that serious *and* irremediable injury *will* otherwise result") (emphasis added).

B. *Challenge Under the Administrative Procedure Act*

Plaintiffs' charge that Directive 1010.9 and AR 600–85, Interim Change No. Ill, are violative of the APA, 5 U.S.C. § 706(2)(A)–(C), and seek district court review of these issuances by characterizing them as the products of "informal rule making" under 5 U.S.C. § 553. The defendants, however, seek dismissal of the complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, because 5 U.S.C. § 701(a)(2) expressly exempts from district court review those agency actions that are "committed to agency discretion by law," and, under 5 U.S.C. § 7106(a)(1), internal security practices are so committed.[11] *Motion to Dismiss,* at 18–19. More importantly, the defendants point out that 5 U.S.C. § 553(a)(2) formally exempts from any "rule making" characterization "a matter relating to agency management or personnel." *Defendants' Reply,* at 12. Realizing the patent force of the Army's latter argument, the union argues, nonetheless, that the Directive and Interim Change constitute "final agency action" by the DOD and the Department of the Army, respectively, under 5 U.S.C. § 704, so that APA review is available in this Court. *Plaintiffs' Response,* at 1–2.

The plaintiffs' Section 704 argument is appealing but flawed in two critical respects. As Section 704 makes clear, "Agency action *made reviewable by statute* and final agency action *for which there is no other adequate remedy in a court* are subject to judicial review." (Emphasis added.) First, as the Army correctly points out, the union points to "no other statute that both waives the government's sovereign immunity and gives district courts jurisdiction to grant relief in cases arising in ... [this type of] federal labor-management context." *Motion to Dismiss,* at 18. In other words, the plaintiffs have failed to identify any statutory provision that permits this Court to review DOD directives or interim changes to army regulations such as these, which are applicable only to a limited group of federal employees—*i.e.,* those designated as "critical."[12] They have failed to identify any precedent which permits such review as well.

Second, as made clear in Part IIA of this opinion, *supra,* because FLRA and MSPB decisions are appealable to the Circuit Court and Federal Circuit, respectively, an "adequate remedy in a court," under § 704, appears to be available (albeit ex post facto) to the plaintiffs. In fact, "[r]eview of ... [an FLRA] order shall be on the record in accordance with section 706...." 5 U.S.C. § 7123(c). Therefore, if the union initiates FLRA proceedings to challenge the testing program, and the FLRA affirms the Army's non-negotiability characterizations, the union may then attack the program at the Circuit Court level under the same APA standards it presses this Court to apply to the program at present: "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; and, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *See Complaint,* Count V. Accordingly, the defendants' motion to dismiss shall be granted.

---

**11.** In this regard, the Army's argument against district court review of the testing program under the APA parallels closely the Army's "non-negotiability" characterization of the program in an FLRA labor dispute context. *See supra* Part IIA.

**12.** Of 420,000 civilian employees with the Department of the Army, only 9500 will be subject to the drug testing program. [Declaration of Colonel Gerald H. Putnam, ¶ 4]

**656**

In accordance with the terms of this opinion, it is by the Court, this 23rd day of June, 1986, hereby

ORDERED that the defendants' motion to dismiss is GRANTED; and it is

FURTHER ORDERED that the plaintiffs' application for a preliminary injunction is DENIED; and it is

FURTHER ORDERED that this action is DISMISSED.