OPINION OF THE COURT
Stanley Parness, J.
Petitioner, as president of the Patrolmen’s Benevolent Association (PBA), and in behalf of its membership, seeks an order permanently enjoining respondents, New York City Police Department (Department), Police Commissioner (Commissioner) and City of New York (City) from implementing that portion of the Department’s interim order No. 36 which would require current and future members of the Department’s Organized Crime Control Bureau (OCCB) to consent and submit to future random drug testing. Petitioner’s collateral application is for a temporary stay pending a resolution of the improper practice petition filed by petitioner with the New York City Bureau of Collective Bargaining concerning the same order No. 36.
PBA is the duly recognized bargaining agent for all members of the New York City Police Department having the rank of police officer and the application is made on behalf of those members currently assigned to the Organized Crime Control Bureau and those who subsequently may come into the Bureau.
The Organized Crime Control Bureau is a division within the Police Department which focuses on narcotics, gambling, prostitution and other forms of organized crime. Service in the Bureau is voluntary and within the Department’s discretion. The Bureau has some 1,200 officers who usually serve four-year tours. To many, it is a desired assignment presenting a path to advancement within the Department.
On June 2, 1986, respondent Department issued interim order No. 36, which in effect provides that applicants to and current members of the OCCB will be required to sign a form which advises them as a condition of initial and continued assignment to the Bureau that they will be required to consent to periodic random drug testing. Essentially, this would require each member, on demand, to submit a urine sample for Dole test analysis. This may take place at any time and is applicable to all officers of any rank within the Bureau.
Order No. 36 also provides that current members of OCCB who choose not to execute such forms and subject themselves to random testing will be transferred out of the Bureau *546 without penalty or loss of rank. Once, however, such consent is signed, refusal to comply with the order would result in disciplinary action by the Department. Any officer after testing who demonstrated positive test findings may be subjected to disciplinary action.
Prior to the issuance of order No. 36, all members of the Department were subject to interim order No. 13 which required submission to Dole testing where there was a "reasonable belief’ that the suspect officer was using drugs. PBA does not contest the right of the Department to have drug testing as part of the screening process of applicants to the Department or any of its bureaus including OCCB. Nor is there objection made to testing as part of a health checkup or where a member is actually suspected of drug use. What is objected to is the elimination in interim order No. 36 of the "reasonable belief’ requirement previously set forth in interim order No. 13. Such elimination in effect would require OCCB members to submit to periodic random testing at the Department’s sole discretion, while testing of other members of the Department remains subject to the "reasonable belief’ requirement of interim order No. 13. This, petitioner contends, violates OCCB members’ constitutional rights under the 4th and 14th Amendments.
The 4th Amendment states that: "The right of the people to be secure in their persons * * * against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.” Its purpose, thus, is to protect against arbitrary and oppressive governmental action and to thereby protect persons from unreasonable intrusion into their reasonable and legitimate expectations of privacy. (United States v Chadwick, 433 US 1, 7 [1977]; Bell v Wolfish, 441 US 520, 588 [1979]; Terry v Ohio, 392 US 1, 9 [1968].) The proscriptions of the 4th Amendment are made applicable to the States through the 14th Amendment (Camara v Municipal Ct., 387 US 523, 528; Ker v California, 374 US 23.)
Our first inquiry, therefore, is whether compulsory employee urine testing constitutes a search which may be subject to 4th Amendment constraints.
Clearly, a person has a legitimate expectancy of privacy in his own body and a right to be free of government intervention therein. Thus, taking blood from the body constitutes a *547 search and seizure within the meaning of the 4th Amendment (Schmerber v California, 384 US 757, 766 [1966]). Though urine, unlike blood, is routinely discharged from the body so that no actual break in the body surface is required for its extraction, it is discharged in such manner and disposed of in such circumstance in which one clearly has a reasonable and legitimate expectation of privacy. Obviously, one does not expect that he will be made to discharge urine so that it can be analyzed in order to discover the personal physiological secrets it may hold. Thus, as with blood, there is an expectation of privacy concerning the "information” body fluids may hold. Accordingly, it has been uniformly held that compulsory urine testing constitutes a search and seizure within the meaning of the 4th Amendment. (Storms v Coughlin, 600 F Supp 1214, 1218 [SDNY 1984]; McDonell v Hunter, 612 F Supp 1122, 1127 [1985]; City of Palm Bay v Bauman, 475 So 2d 1322 [Fla App 1985]; Allen v City of Marietta, 601 F Supp 482, 488-489 [ND Ga 1985].)
However, not all searches and seizures are prohibited by the 4th Amendment. Only unreasonable intrusions are proscribed (Carroll v United States, 267 US 132, 147 [1925]). What must be determined is whether the intrusions contained in interim order No. 36 are, nevertheless, reasonable and thus not violative of the 4th Amendment.
"Reasonableness” is not susceptible of precise definition but must be determined in each case by balancing the degree of intrusion of the search on the person’s 4th Amendment right of privacy against the need for the search to promote some legitimate governmental interest (Katz v United States, 389 US 347, 351 [1967]; Terry v Ohio, supra; Illinois v Lafayette, 462 US 640 [1983]).
Viewed in this context, we must determine whether the degree or scope of intrusiveness occasioned by compelling members of OCCB to submit samples for urine analysis is justified by an overriding governmental interest which will be promoted thereby.
The first factor in the reasonableness test, the degree of intrusiveness, is a relative term. A person’s perception as to the scope or degree of any governmental intrusion is ordinarily dependent upon what his legitimate expectancy of privacy is in the area intruded upon. (Katz v United States, supra, p 361.) As noted, a person has a legitimate expectancy of privacy in his body fluids. And, as with blood testing, compulsory *548 urine testing has been held sufficiently intrusive to warrant protection under the 4th and 14th Amendments (Storms v Coughlin, supra).
Indeed, compelling argument can be made that the urine testing contemplated under interim order No. 36 presents an even greater intrusion on privacy than does blood testing. Drawing blood is at most a benign procedure. No embarrassment is involved and it is no more invasive or painful than a pin prick. Under the procedure contemplated by respondent Department the urine sample must be provided in the presence of a superior officer of the same sex.
Thus, the subject officer would be required to perform before another person what is an otherwise very private bodily function which necessarily includes exposing one’s private parts, an experience which even if courteously supervised can be humiliating and degrading (Tucker v Dickey, 613 F Supp 1124, 1130 [WD Wis 1985]). There is no reason to believe that a police officer would find the procedure any less intrusive than would another citizen.
Respondents contend, however, that police officers assigned to OCCB have a diminished expectancy of privacy in this area. It is true that by the very nature of their job, police should anticipate that their employer would have serious concerns that their ability to discharge their duties be not impaired by drugs and should anticipate that the employer may place reasonable conditions on employment including scrutiny for drug use.
However, it is also true that though such expectancy of privacy may be diminished, officers still retain substantial 4th Amendment rights (Security & Law Enforcement Employees, Dist. Council 82 v Carey, 737 F2d 187, 202 [1984]).
Respondents’ second contention is that since employment in OCCB is purely by invitation, as employers, they have an absolute right to condition same on submission to random testing. While a government may place conditions on employment, it may not as a precondition require waiver of all rights under the 4th Amendment.
In a long line of cases, the Supreme Court has consistently adhered to the principle that the State may not condition access to public benefits or privileges on the waiver of a constitutional right. In Frost Trucking Co. v Railroad Commn. (271 US 583, 593-594), the Supreme Court stated: "It is not necessary to challenge the proposition that, as a general rule, *549 the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.” Since Frost, the Supreme Court has applied this principle in a wide variety of contexts. (See, Lefkowitz v Cunningham, 431 US 801, 804-806 [1977] [statute conditioning office in a political party on waiver of 5th Amend declared unconstitutional]; Lefkowitz v Turley, 414 US 70, 82 [1973] [statute requiring architects to waive 5th Amend privilege or be disqualified from eligibility for public contracts held unconstitutional]; Perry v Sindermann, 408 US 593 [1972] [State may not condition public employment on waiver of 1st Amend free speech rights]; Sherbert v Verner, 374 US 398 [1963] [unemployment benefits may not be conditioned on relinquishment of rights under the free exercise of religion clause of the 1st Amend]; Garrity v New Jersey, 385 US 493 [1967] [continued public employment may not be conditioned on waiver of 5th Amend rights].)
The vast majority of courts that have confronted the issue of consent to otherwise unconstitutional searches in the law enforcement setting concluded that such consents are also invalid. Thus, in Blackburn v Snow (771 F2d 556 [1st Cir 1985]), the court held that the consent by a visitor to the county jail was ineffective because access to the jail was conditioned on a waiver of 4th Amendment rights. In Thorne v Jones (585 F Supp 910, 918-919 [MD La 1984]), the court refused to find consent to a strip search by visitors to a correctional facility despite the fact that signs were posted and the visitors signed forms consenting to strip searches of their persons at any time the prison authorities decided to conduct such searches. Similarly, in Armstrong v New York State Commr. of Correction (545 F Supp 728, 731 [NDNY 1982]), the court held that prison correction officers’ consent to searches obtained as a condition of employment could not justify an otherwise unconstitutional search. (See, McMorris v Alioto, 567 F2d 897, 901 [9th Cir 1978] ["consent” of visitors to courthouse insufficient to constitute voluntary consent consis *550 tent with Schneckloth v Bustamonte, 412 US 218]; see also, Hunter v Auger, 672 F2d 668 [8th Cir].)
Similar holdings have invalidated consents to future arbitrary searches of law enforcement employees as a condition of their employment (McDonell v Hunter, 612 F Supp 1122, 1131 [SD Iowa] [consent to arbitrary drug testing of firemen and police]; Armstrong v New York State Commr. of Correction, 545 F Supp 728, 731, supra [NDNY] [consent to strip search of prison guards]; Security & Law Enforcement Employees, Dist. Council 82 v Carey, 737 F2d 187 [2d Cir 1984] [consent to strip search of prison guards]).
As best summed up in McDonell (supra, p 1131): "[a]dvance consent to future unreasonable searches is not a reasonable condition of employment.”
Respondent contends, however, that the 4th Amendment is not violated here because the searches are not "arbitrary”, i.e., that no one person in OCCB is singled out but all are subject to examination at about the same time. However, as to each person tested the procedure is arbitrary to the extent that it is a standardless search. The 4th Amendment purpose is to protect each citizen and no unlawful government search can ever be justified on the premise that it will be applied equally to all members of the offended class.
Having concluded that compulsory random drug testing is intrusive and that all police officers continue to retain privacy rights under the 4th Amendment, albeit diminished ones, the issue remains whether the intrusiveness of the contemplated procedure under interim order No. 36 is, nevertheless, "reasonable”. This would require a showing that such intrusiveness is justified, that is, that implementation of the order would promote some legitimate governmental interest which overrides its potential impact on the individual officer’s privacy (Bell v Wolfish, supra, p 559).
Now it is quite clear that compulsory testing of an ordinary citizen cannot be justified on any basis short of a "clear indication” or probable cause to believe that the person’s body fluids contain the evidence sought. (Schmerber v California, supra; Matter of Abe A., 56 NY2d 288, 291 [1982].)
However, as noted, police in their official function should not expect to have the same degree of privacy as that of an ordinary citizen, so that it would be unfair if their employers were held to the same high probable cause standard required for citizen testing. Some lesser quantum of justification would *551 therefore be consistent with the diminished privacy rights of police employees.
The testing as contemplated under order No. 36 has in effect eliminated individualized cause of any degree as a predicate to testing. The question is have respondents shown sufficient justification to make its proposed standardless searches nevertheless "reasonable” under the 4th Amendment? In response, respondent Department urges the following in justification for the proposed testing.
It asserts that as an employer it has vital interest in discovering the extent of drug abuse in the workplace and to identify abusers. No doubt every employer would have a similar interest and would find such information useful. But that by itself would not justify subjecting employees to testing. Any governmental agency could properly make a case for drug testing as a useful investigatory tool in culling out drug abusers and eliminating the deleterious effect that such use may have on an agency’s operation. As one court put it: "no doubt about it — searches and seizures can yield a wealth of information useful to the searcher. (That is why King George Ill’s men so frequently searched the colonists.) That potential, however, does not make a governmental employer’s search of an employee a constitutionally reasonable one.” (McDonell v Hunter, supra, p 1130.)
A further justification offered for testing is the deterrent effect it will have on drug use by the officers through fear that such use may be disclosed at any time. However, the Department has presented almost no persuasive evidence that drug use is no more than a very occasional problem at best. By its own statistics only 13 officers last year and 9 to date in 1986 out of a force of over 26,000 were tested positive for drug use. Those statistics submitted of drug use by adolescents in the general population or in applicants to the Department are not terribly relevant. We can assume that a certain number of such applicants who show drug use are either denied appointment to the Department or are culled out during their probationary period. As to comparison with general population statistics, we can also assume that one opting for the disciplined and highly supervised life of an officer is the type of person much less likely to violate the law and use drugs. So that general population statistics are not very probative of what exists in the Department.
It must also be considered that present and future members *552 of OCCB undergo additional drug testing as part of their application screening process. In addition, it can be assumed that because of the sensitive nature of the OCCB assignment, applicants receive intensive investigation as to their past police record, behavior, etc., in the Department before they are accepted. Further consideration is no doubt given to their character, personality and ability to resist stress. It can be reasonably concluded that those finally accepted for membership in OCCB are among the best in the force and of a nature even less likely to use drugs than others in the Department.
Thus, without any direct or even circumstantial proof that a drug problem exists in OCCB, it is difficult to justify random testing as a deterrent when there is little indication' that there is any significant drug use to deter.
Finally, it is argued that police integrity and public’s confidence therein is seriously undermined by reports of police drug abuse, that drug use by officers makes them more susceptible to corruption and that by reason of the fact they carry weapons, drive cars and are engaged in dangerous work, those impaired by drug use present a positive danger to others.
Respondent additionally points out that drug use within its OCCB which specifically is concerned with enforcement of narcotics and vice enforcement would present an increased potential for corruption. However, the statistics submitted, if valid, show only a few instances of abuse (two in 1984 and four in 1985 and none were submitted for 1986). Hardly evidence of a significant problem.
There is no question that the government has a recognized and a legitimate interest in maintaining police integrity, order and discipline in its law enforcement agencies. (Biehunik v Felicetta, 441 F2d 228, 231.) To this end, it is entirely proper for the Department to have serious concerns about drug use among its members and undertake reasonable efforts to ferret out abusers. By reason thereof and the peculiarly sensitive nature of the OCCB assignment, we recognize that officers assigned should anticipate a diminished expectancy of privacy in the area of drug testing. Does this, however, warrant the standardless testing proposed under interim order No. 36?
A review of the relevant cases in which 4th Amendment rights have been asserted in law enforcement or public service context would be instructive on this issue.
In Security & Law Enforcement Employees, Dist. Council 82 v Carey (737 F2d 187 [1984], supra), the Second Circuit was *553 confronted with rules which required, inter alia, that correction officers submit to random strip searches. Strip searching involves disrobing before a supervisor for visual inspection (a work condition of apparent equal intrusiveness with that requiring an officer to discharge urine before his supervisor). Justification for such strip searches was based upon well-documented statistics that drug use was rampant among inmates and that weapons and drugs were being smuggled into prison in alarming amounts. The great danger presented if prisoners obtain such contraband and the fact that correction officers were, at least circumstantially, a most likely source of the drugs and contraband found in prisons, make the reason for strip searches at least, and perhaps more, compelling than those advanced for drug testing herein. In weighing the right of privacy of correction officers, diminished as it may be, the Carey court found such arbitrary searches constitutionally impermissible.
As stated by the court at page 210, "Random searches of correction officers are violative of the fourth amendment’s mandate against unreasonable searches * * * such searches severely trammel the legitimate expectations of privacy of correction officers.” (Security & Law Enforcement Employees, Dist. Council 82 v Carey, supra.)
However, recognizing the need to permit supervisors sufficient freedom to take appropriate action against drug use and smuggling and still safeguard the residual right of the employees, the court adopted a "reasonable suspicion” standard as a requirement for searches of officers. In arriving at this "reasonable suspicion” approach the court borrowed from the standard used in border cases (see, United States v Asbury, 586 F2d 973 [2d Cir 1978]). It concluded that the reasonable suspicion standard takes into account their diminished expectancy of privacy and at the same time provides sufficient scope to accomplish the employer’s legitimate needs to control drug abuse among its officers.
As to those rules requiring submission to body cavity searches (noninvasive visual inspection of mouth, etc.), the court would not permit such searches except with a warrant based upon probable cause. (The court in Tucker v Dickey, 613 F Supp 1124, 1130 [1985], supra, has even equated compulsory urine testing with body cavity searches.)
In Hunter v Auger (672 F2d 668 [1982], supra), a similar conclusion was reached concerning searches of visitors to *554 prison. Recognizing the danger that smuggling of contraband presented, the court, nevertheless, proscribed searches based on less than reasonable suspicion. McDonell v Hunter (612 F Supp 1122 [SD Iowa 1985], supra) dealt with the same issues as are presented herein. In that case, correction officers were required to sign a consent which required them on demand to submit to various searches including random urine drug testing. Again, the same justification was offered as in the instant case, concerning the danger of drug use by one in law enforcement and in particular within a prison setting. The court, nevertheless, concluded that compulsory random urine testing is prohibited by the 4th Amendment. Citing Hunter (supra) and Security & Law Enforcement (supra) that court concluded that a demand for urine testing can be permitted only "on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience, that the employee is then under the influence of alcoholic beverages or controlled substances.” (612 F Supp, at p 1130.) In Division 241 Amalgamated Tr. Union v Suscy (538 F2d 1264, 1267), the court permitted drug testing of bus drivers. However, the work rule in that case provided that such test be done when the driver was actually involved in an accident or there was reason to suspect his drug use. Again, what appears to be a reasonable suspicion standard.
A most identical set of facts as the instant case was presented to the court is City of Palm Bay v Bauman (475 So 2d 1322 [Fla App 1985], supra).
There, both the police and fire departments of that city were required to submit to urine drug testing. The justification offered was essentially the same as that argued by respondent herein. This State appellate court held that random drug testing of the police violated their 4th Amendment rights. Indeed, a stronger case can be made for testing of firefighters. They face daily dangers and drug use would have a more predictably direct impact on their firefighting duties. Nevertheless, standardless drug testing was precluded.
In Matter of King v McMickens (120 AD2d 351 [1st Dept, May 1986]), the court upheld the dismissal of a correction officer for failure to submit to urine testing. There, however, the basis for the request was confidential information that the officer was at a drug location and was using drugs.
The cases cited by respondent as supportive of random testing are not necessarily contrary. In McKecknie v Dargon (CU No. 84-4339, US Dist Ct, ED), the court dismissed a civil *555 rights action based upon the officer’s complaint that he was compelled to submit to urine testing. In that case, a revolver belonging to the officer was used in an armed robbery by a person in whose apartment the officer was found sleeping the next day. In addition, before ordering drug testing, the supervisor learned that the officer’s performance in the past few months was going "down hill”. In connection with the investigation by his superiors into these circumstances, the officer was questioned and also directed to take a urine test.
This was not a case of random testing. Indeed, in validating the right to test the officer the court specifically stated that "plaintiff does not deny that defendants had reasonable justification for initiating the testing.” Thus, there were presented some objective facts which reasonably caused his supervisor to focus on the officer to suspect drug use. A "reasonable suspicion” standard, though not so articulated by the court.
Also cited in respondent’s brief is Matter of Krolick v Lowery (32 AD2d 317 [1969]). There, the court held that the fire department was correct in disciplining a firefighter for refusing to obey an order requiring him to submit to blood testing for alcohol. However, the departmental rule upon which the order was based had as a necessary predicate that "reasonable grounds exist for believing the member to be intoxicated”.
In Curry v New York City Tr. Auth. (86 AD2d 857), an employee was discharged because of a positive urine test. However, that test was administered as part of a health checkup required of all employees who return to work after a leave of absence.
No one questions the right to establish as a condition of employment the requirement of a health checkup, particularly where the work involves physical exertion or activity. Indeed, petitioner herein does not contest the right of the Department to continue to have routine checkups and screening. But routine health examinations are far different than testing for the specific purpose of finding evidence of drugs.
Respondent cites cases involving drug testing in the military. (Murray v Haldeman, 16 MJ 74 [CMA 1983].) While police employment has some paramilitary features, it is not the same as service in the military. Servicemen are subject to far more discipline and regimentation and thus retain a more diminished expectancy of privacy than civilians. (See, Parker v Levy, 417 US 733, 758 [1974].)
*556 Nor are cases involving prisoners particularly relevant. Compulsory testing of prison inmates was upheld in Storms v Coughlin (600 F Supp 1214, supra). There, too, the courts found that prisoners retain few 4th Amendment rights and that the drug problem among inmates was sufficiently serious to warrant such testing. Interestingly, as to prisoners, one court held that even taking into account diminished prisoners’ rights, such testing merely to determine whether a problem exists is not warranted. (Tucker v Dickey, 613 F Supp 1124 [WD Wis], supra.)
The one case involving drug testing cited by respondent which respondent claims is particularly supportive of its position is Shoemaker v Handel (619 F Supp 1089 [DNJ 1985]). The District Court found valid a New Jersey Racing Commission regulation requiring jockeys to submit to random testing. In doing so, the court sought to distinguish its holding from the reasonable suspicion standard which it acknowledged was found necessary in most cases.
Essentially, it alluded to the uniqueness of racing as a "pervasively regulated industry”, the fact of licensing as a requirement to be a jockey, the inherent danger of the sport and the fact that the potential for harm from drug use is direct, while in the police and correction officer circumstances (McDonell v Hunter, supra) the impact from drug use was more "attenuated” (Shoemaker v Handel, supra, at p 1102).
Shoemaker (supra), therefore, on close examination, is either not applicable to the facts in the instant proceeding, or is clearly distinguishable therefrom or simply out of step with the rest of the authorities.
After reviewing the law applicable to the facts presented herein, the court finds that respondent’s interim order No. 36 fails to comply with 4th Amendment mandates. Specifically, respondent has failed to demonstrate or to document that drug use presents a discernible problem or danger sufficient to warrant the constitutional intrusion occasioned by standard-less drug testing of the approximately 1,200 members of the OCCB. That such testing may have some incalculable deterrent effect, turn up an occasional abuser or improve public confidence in the police does not constitute that degree of justification required under the reasonableness test set forth in Katz (supra) or the weight of case authority. Indeed, the justifications offered by respondent in this case are of no greater degree and present no greater imperatives than those *557 found in the cases cited (e.g., McDonell v Hunter, 612 F Supp 1122, supra; City of Palm Bay v Bauman, supra; Security & Law Enforcement Employees, Dist. Council 82 v Carey, 737 F2d 187, supra) in which testing was permitted only on the basis of reasonable suspicion.
In sum, respondent has failed to demonstrate that the present reasonable belief or suspicion standard for drug testing found in order No. 13 coupled with greater vigilance, drug education and other less intrusive methods would not substantially accomplish the same purpose they now seek without subjecting officers to the serious invasion of privacy which would be occasioned were order No. 36 to be implemented.
Interim order No. 36 having failed to meet the requirements of reasonableness under the US Constitution 4th Amendment, the New York State Constitution (art I, § 12) can effect no less a measure nor would any less a standard be consistent with our State Constitution.
In coming to this conclusion the court must take into account that standardless governmental searches are antithetic to our basic constitutional rights. Once it was random searches of homes and personal effects that were our primary 4th Amendment concern. Now as science becomes more adept at unlocking the secrets contained in our body and its fluids we must be careful that the private information so obtained be as protected as that contained within our private papers.
Thus, we must be as vigilant in protecting the rights of the individual to be secure against standardless physiological searches of his body as our founding fathers were in securing their homes from the random evidence-gathering searches that were engaged in by the Crown.
In sum, this court concludes that insufficient justification has been shown by respondent to warrant standardless drug (Dole) testing of OCCB members. Nor do I find that the requirement that present and future members of OCCB execute consent to such testing is a reasonable condition for their assignment or for continued assignment to OCCB.
The respondent may, however, continue to test officers upon a reasonable suspicion basis. That standard is flexible enough to afford the full measure of 4th Amendment protections without posing a barrier to the exercise of this employer’s legitimate right to seek out drug use by its employees.
Accordingly, petitioner’s application is granted to the extent that respondent be enjoined from implementing New York *558 Police Department interim order No. 36 insofar as it requires present and future members of OCCB to consent or submit to urine analysis for drugs unless the same is based upon reasonable suspicion predicated upon specific objective facts and reasonable inference drawn from those facts in the light of experience that the officer to be tested is wrongfully using drugs. This is without prejudice to the Department’s right to continue drug testing as part of the application process for assignment to OCCB.
In view of the disposition made with respect to petitioner’s application for injunctive relief, the court need not pass upon petitioner’s further application for a stay pending resolution of its improper practice petition now pending before the Office of Collective Bargaining.