**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, et al., Plaintiffs,**

v.

**Caspar WEINBERGER, Secretary of Defense, et al., Defendants.**

**No. CV486–353.**

United States District Court, S.D. Georgia, Savannah Division.

Dec. 2, 1986.

---

Mark Roth, Stuart Kirsch, American Federation of Government Employees, AFL–CIO, College Park, Ga., William Moore, Savannah, Ga., for plaintiffs.

Robert J. Cynkar, Richard Greenberg, Robert C. Chesnut, Jeffrey S. Paulsen, Dept. of Justice, Washington, D.C., Major Vincent E. Reilly, Office of the Judge Advocate General, Dept. of the Army, Washington, D.C., of counsel, for defendants.

## ORDER

EDENFIELD, District Judge.

Plaintiffs brought this action seeking injunctive relief and a declaratory judgment with respect to the validity of Directive 1010.9 of the Department of Defense (DoD Directive) and Army Regulation 600–85, Interim Change No. I11. In essence, the plaintiffs challenge the constitutionality of periodic drug testing of civilian employees occupying "critical"positions with the Department of Army. Before the Court is the defendants' motion to dismiss.

## I. BACKGROUND

### A. *Nature and Scope of the Fort Stewart Civilian Drug Testing*

In April, 1985, the Department of Defense issued its Directive 1010.9, calling for mandatory periodic drug testing by urinalysis of civilian DoD employees holding "critical" jobs. Army Regulation 600–85, Interim Change Ill was promulgated in February, 1986, and works to implement the DoD Directive, rendering it applicable to civilian employees holding "critical" positions with the Department of the Army.[1] The regulation lists as critical positions:

(1) Law enforcement.

(2) Positions involving national security of the army at a level of responsibility in which drug abuse could cause disruption of operations or the disclosure of classified information that could result in serious impairment of national defense.

(3) Jobs involving the protection of property or persons from harm, or those where drug abuse could lead to threats to the safety of personnel.

The named individual plaintiffs in this case are police officers at Fort Stewart, Georgia. They are among the approximately forty civilian employees (out of some 2,000 bargaining unit workers at the installation) whose positions qualify as "critical" under the regulation.

In June, 1986, the individual plaintiffs were issued DA Form 5019–R. The officers were required to sign this form as a condition of continued employment in their current positions. The form outlines the nature of the testing to which the employees are to be subjected and indicates the consequences attendant upon declining to sign the form or refusing to cooperate in

---

1. A detailed discussion of the DoD Directive and the Army Regulation implementing it can be found in *Nat'l Fed. of Fed'l Employees v. Weinberger,* 640 F.Supp. 642 (D.D.C.1986) ("*NFFE*").

the testing program after having signed. Of significance to this litigation, the form purports to operate as a consent to submit to periodic testing not only where probable cause exists to believe that the employee has been using drugs (or after an accident involving government equipment), but also periodically and irrespective of the existence of probable cause or reasonable suspicion concerning drug use.[2]

Initial testing is to be conducted using the relatively inexpensive EMIT test marketed by the Syva Company. This test measures the presence of drugs or drug "metabolites" in a person's urine, and is approximately 95–99% accurate. Only temporary action may be taken by the Army against an individual whose urine tests positive by the EMIT test. A positive EMIT test must be verified through the more expensive gas chromatography testing process which, according to testimony given to this Court, is virtually 100% accurate, assuming that proper chain of custody procedures are followed.[3] If this latter test does not reveal the presence of drugs or drug metabolites in a urine sample that tested positive by the initial EMIT test, no action may be taken against the employee, and any temporary action already taken must be rescinded. A positive verification by the gas chromatography test, however, will lead to transfer of the employee to a non-

---

2. DA Form 5019-R states:

SECTION A—REQUIREMENTS

As a prospective or current employee in a position designated by the Department of the Army and approved by the Office of the Secretary of Defense as critical to national or internal security or to the protection of persons or property, you are required to read and sign this statement as a condition of employment. If you are an applicant for a critical job and fail to sign this agreement, you will not be selected for the position. If you are currently in a critical job and refuse to sign the condition of employment, you will be voluntarily or involuntarily reassigned or demoted to a noncritical job or separated from Federal employment. If you sign the condition of employment and later refuse to submit to urinalysis testing, you will be non-selected, reassigned, demoted, or separated according to applicable regulations. To verify that you are not currently using drugs, you will be required, as a condition of your continued employment, to submit a urine sample for testing purposes; (1) periodically, on an unannounced basis, (2) when there is probable cause to believe that you are under the influence of drugs, and/or (3) when there is a

mishap or safety investigation being conducted in relation to an accident involving government-owned vehicles, aircraft, or equipment. To assure the validity of these tests, a staff member of the same sex will observe you while you are providing the sample. Detection of drug usage through confirmed positive urinalysis test results may be cause for a determination that you have failed to meet the conditions necessary for your continued employment in the position. Medically prescribed drugs authorized by a physician and confirmed by appropriate evidence are excluded from such determinations. The results of urinalysis will be used only for clinical and necessary administrative purposes. You are entitled to any additional and reasonable information or clarification you desire prior to signing the agreement. A copy of the signed agreement will be given to you and your supervisor. The original will be placed in your Official Personnel Folder.

This is to certify that I understand the contents of the policy described above and the reasons therefore, and that I agree to adhere to the terms of this policy as a continuing condition of my employment in positions to which this agreement applies.

_____ _____
SIGNATURE OF EMPLOYEE/APPLICANT DATE SIGNED

It should be noted that in response to objections raised concerning the intrusiveness of the testing procedure, the Army has determined that direct observation of the employee during the process of urination will not be required unless it appears that the employee is attempting to substitute or tamper with his urine sample. The Court notes also that the Army has stressed that, notwithstanding the wording of the form, and the language of Interim Change No. Ill page 5–14f(7) (allowing for all post-accession testing to be conducted at "the commander's discretion"), the testing will be carried out on the basis of neutral criteria, perhaps by periodic lottery selection of employees on the basis of social security numbers.

3. For details concerning the nature and accuracy of the testing procedures employed, see the court's discussion in *NFFE, supra,* note 1.

critical position of a similar type and at a comparable rate of pay, if such a position is available. If no such position is available, the employee will be terminated. Some provision is made for referral of eligible offenders to drug counseling and treatment facilities; the criteria for determining "eligibility," however, are not defined in the Interim Change.

Testing was to begin at Fort Stewart on October 7, 1986. The instant action was filed by the individual plaintiffs and the labor organization representing them on October 6. The plaintiffs have alleged that implementation of the civilian drug testing program, in its current form, will infringe upon the fourth and fifth amendment rights of the plaintiffs, and that the Army program is violative of the Drug Abuse Office and Treatment Act (DAOTA), the Civil Service Reform Act (CSRA), and the Administrative Procedure Act (APA). The parties initially agreed to a temporary stay of the drug testing and, after a hearing before this Court on November 11, 1986, the stay was voluntarily extended until November 26.

B. *Prior Litigation Concerning the Army's Civilian Drug Testing*

On June 23, 1986, the United States District Court for the District of Columbia dismissed a suit challenging the very regulations under consideration in the instant action. *Nat'l Fed. of Fed'l Employees v. Weinberger*, 640 F.Supp. 642 (D.D.C.1986) ("*NFFE*"). That court found that the comprehensive administrative structure of the Civil Service Reform Act (CSRA) deprived the plaintiffs, a union local of the National Federation of Federal Employees and several of its members, of any right to bring an action in a federal district court challenging the validity of the regulations at issue. The basis for the D.C. district court's determination was its belief that adequate judicial review of the merits of any constitutional claim the plaintiffs might have would eventually, "albeit ex post facto," *id.* at 655, be available through any one of three channels. First, an employee against whom "adverse" action is taken on the basis of a positive urinalysis test can appeal the decision to the Merit Systems Protection Board (MSPB), 5 U.S.C. § 7512, and can then appeal the MSPB decision to the Court of Appeals for the Federal Circuit. Second, notwithstanding that the Army has taken the position that its civilian drug testing program is a nonnegotiable condition of employment because it relates to internal security practices, *see* 5 U.S.C. § 7106(a), the D.C. district court found jurisdiction to determine the regulation's negotiability to lie with the Federal Labor Relations Authority (FLRA), the decisions of which are appealable to an appropriate Court of Appeals. Third, with respect to claims of constitutional violations brought by those against whom no adverse action is taken on the basis of a positive test (and who thus would have no access to the MSPB machinery) or by those who tested negatively (but who nevertheless question the constitutionality of the testing procedure), the D.C. district court determined that nothing would preclude the bringing of a *Bivens*-type action (*see Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) in a federal district court. Citing *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), the D.C. district court held that "where 'the ultimate question on the merits ... [of a] case may be appropriately categorized as one of "federal personnel policy," ' ... and the CSRA's 'elaborate remedial system' will protect the constitutional and statutory interests at issue, a plaintiff must pursue challenges to agency action within that system." 640 F.Supp. 650 (citations omitted).

The *NFFE* plaintiffs sought an emergency injunction pending appeal from the Court of Appeals for the District of Columbia Circuit. Finding that "[a]ppellants ha[d] not demonstrated the requisite irreparable injury and likelihood of success on the merits necessary to justify issuance of an injunction," a panel of that Court of Appeals denied the requested relief. (Defendant's Exhibit F). Appeal from the dis-

missal of the district court action is currently pending.

Prior to the D.C. district court's decision, on May 21, 1986, the American Federation of Federal Employees (which is a party to the instant action), a local unit of that organization, and several individual local members had filed suit in the District Court for the Western District of Washington at Tacoma. In that action, as in the suit before the Court (and in contrast to the *NFFE* suit), plaintiffs sought a nationwide injunction against implementation of the Army's civilian drug testing program. The Washington district court, rendering its decision on August 5, 1986, found that the issues and parties to the action before it were substantially identical to those on appeal to the D.C. Circuit Court of Appeals. Thus, in the exercise of its discretion, the court dismissed the action without prejudice. *Am. Fed'n of Gov't Employees v. Weinberger,* No. C86–242T, slip op. (W.D. Wash. Aug. 5, 1986).

II. LAW AND ANALYSIS

█ The defendants here seek dismissal on both procedural and substantive grounds. Strongest among the government's arguments is its contention that this Court should dismiss in the interests of comity, giving due respect to the ruling of the Washington District Court, and refraining from interference with the conduct of the litigation in the District of Columbia.

It is well established in federal jurisprudence that generally "[c]onsiderations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously." *Washington Metropolitan Transit Authority v. Ragonese,* 617 F.2d 828, 830 (D.C.Cir.1980). Were this a suit on a contract, it might well be that the dismissal prayed for by the government would be warranted, for technically a very similar action is being "heard" in the Dis-

trict of Columbia, notwithstanding that it is the *dismissal* of an earlier suit that is being heard on appeal. *See West Gulf Maritime Ass'n v. ILA Deep Sea Local 24,* 751 F.2d 721 (5th Cir.1985). But several factors militate very strongly against dismissal. Examination of the nature of the rights at issue in and the parties to this litigation and an analysis of the highly significant judicial decisions that have issued during the months since the D.C. and Tacoma courts denied injunctive relief have led the Court, after long and difficult consideration, to the conclusion that dismissal, under the very narrow circumstances presented by this case, is inappropriate. Further discussion of this matter follows an analysis of the substantive issues.

The Court finds it unnecessary to address the plaintiff's APA, DAOTA or due process arguments, because a review of the adequacy of CSRA remedies, in light of the fourth amendment considerations raised in this case, clearly indicates the plaintiffs' entitlement to injunctive relief.

A. *Fourth Amendment Issues*

Due to a number of factors, the federal courts are only now being faced on a regular basis with challenges to the constitutionality of drug testing programs in the public sector. Only recently has the technology of drug testing attained a level of accuracy that (arguably) could withstand a due process challenge. More significant, it is only within the past year or two that the massive national movement against the scourge of drugs has prompted the introduction of a myriad of drug testing programs for public sector employees at the local, state and federal levels.[4] The scope and pervasiveness of the very real drug problem is so potentially devastating for the welfare of the nation that it has been thought by many to justify the implementation of programs calling for testing of employees on a periodic basis, without reference to probable cause or reasonable suspi-

---

4. The few existing federal drug testing programs for civilian workers, for example, appear to have been only gradually implemented within approximately the past six to eight months, and an Executive Order, entitled "Drug-Free Federal Workplace," signed by President Reagan on September 15, 1986, indicates that comprehensive random testing of all government workers in "sensitive" positions, while imminent, has not yet been put into full operation.

cion. It is the challenges to such new programs that are now reaching the federal courts with increasing frequency. While several relevant cases were decided in 1985, most decisions in this area have been rendered in 1986, many of these in the past several months.

The Court emphasizes the novel nature of the questions presented in order to highlight the fact that a judicial trend is finally beginning to emerge clearly, and with each new decision on the subject of periodic drug testing it becomes more apparent that testing of civilians by urinalysis, absent some form of individualized suspicion, is in almost all cases offensive to the mandates of the fourth amendment. In fact, almost every court faced with facts similar to those of the case at bar has held or conceded that urinalysis constitutes a search within the meaning of the fourth amendment, and not a single case has held drug testing of law enforcement personnel by urinalysis to be permissible absent probable cause or reasonable suspicion.

The government nevertheless has advanced several arguments in support of its position that testing without individualized suspicion is appropriate, and that the plaintiffs here, as *federal* law enforcement personnel, stand in a position different from that of state or local officers. Some of these arguments are of questionable validity in light of recent decisions; one argument may have merit; another not only is misguided but also is truly frightening in its implications. The Court will deal with the government's arguments seriatim.

1. *Urinalysis Constitutes a Search or Seizure*

 If at one time it might have been possible to argue that urinalysis does not constitute a search or seizure, such an argument is now entirely untenable. That this is so was relatively clear at the time this action was brought. *See Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir.1986); *Div. 241 Amalgamated Transit Union*

*(AFL–CIO) v. Suscy,* 538 F.2d 1264 (7th Cir.1976); *Capua v. City of Plainfield,* 643 F.Supp. 1507 (D.N.J.1986); *Allen v. City of Marietta,* 601 F.Supp. 482 (N.D.Ga.1985); *McDonell v. Hunter,* 612 F.Supp. 1122 (S.D.Iowa 1985); *Storms v. Coughlin,* 600 F.Supp. 1214 (S.D.N.Y.1984); *Patchogue–Medford Congress of Teachers v. Bd. of Ed.,* 119 A.D.2d 35, 505 N.Y.S.2d 888 (2d Div.1986); *Caruso v. Ward,* 506 N.Y.S.2d 789 (Sup.Ct.1986); *Turner v. Fraternal Order of Police,* 500 A.2d 1005 (D.C.Ct. App.1985). In light of the cases decided since this suit was filed, a contrary position can hardly be argued. *Nat'l Treasury Employees Union v. Von Raab,* 649 F.Supp. 380 (E.D.La.1986); *Penny, et al. v. City of Chattanooga,* 648 F.Supp. 815 (E.D.Tenn.1986); *Lovvorn, et al. v. City of Chattanooga,* 647 F.Supp. 875 (E.D.Tenn. 1986).

Requiring an individual to submit to urinalysis involves an invasion of privacy and is a search or seizure within the meaning of the fourth amendment; none of the many cases cited by the government holds to the contrary. While it would appear that the matter is firmly settled, the Court takes this opportunity to note the highly intrusive nature of such a search, notwithstanding the steps taken to minimize the intrusiveness of the actual taking of urine from an individual. *See infra* § II.A.2. As the *NFFE* court noted, urinalysis can result in a positive test for marijuana or marijuana metabolites for up to two to three weeks after an individual has ingested the drug. 640 F.Supp. at 647. Thus, one may be subject to the adverse consequences of a positive drug test even where no "intoxication" is involved. These tests enable the individual or organization administering them to monitor the off-duty conduct of employees, and represent a technological advance that must be cautiously examined and which, if overzealously implemented, could threaten much of the privacy most citizens now take for granted.[5] Putting

---

5. Because the tests can yield positive results days and even weeks after drug use, they in effect allow the employer to control the employee's

off-duty behavior.... If the employer can fire a person for smoking marijuana on a Saturday night, what prevents him from regu-

aside the argument, which seems valid, that drug use is incompatible with federal employment, it must be realized that the intrusion into the private affairs of an individual inherent in the taking of a urine sample is qualitatively very, very different from the intrusion involved in the taking of fingerprints or fingernail and hair clippings; the latter are merely evidence of certain immutable characteristics of an individual's body.[6] Thus, the taking of a urine sample most closely resembles the taking of a blood sample, which has been held to be a highly invasive search and seizure. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). *See generally Nat'l Treasury Employees Union v. Von Raab, supra,* at 386–7. *But see Mack v. United States,* No. 85 Civ. 5764, slip op. at 7 (S.D.N.Y. April 21, 1986).

2. *Urinalysis Absent Individualized Suspicion is Unreasonable*

■ The government correctly points out that searches and seizures are only prohibited where they are "unreasonable." It is the government's position that, even if the taking of urine samples constitutes a search or seizure, periodic drug testing of police officers at a federal military installation is reasonable even when not implemented on the basis of individualized suspicion.

"The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.'" *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 741, 83 L.Ed.2d 720, 731 (1985), quoting *Camara v. Municipal Court,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1734–35, 18 L.Ed.2d 930 (1967). In the context of mandatory drug testing of government employees through the tak-

ing of urine samples, some general guidelines have developed. While one court has held that probable cause is required before testing may be required, *Nat'l Treasury Employees Union v. Von Raab, supra,* it generally has been accepted that an employee does have an expectation of privacy upon taking a position with the government that is diminished in comparison with that reasonably held by members of the public at large. Thus, where a governmental employee's position is such that the employee's drug use could endanger the public safety or welfare, it has been held that it is not necessary to adhere to the probable cause standard, and the employee may be subjected to mandatory testing upon a showing of reasonable suspicion that he has used drugs. *McDonell v. Hunter, supra* (reasonable suspicion must be "based on specific objective facts and rational inferences that may be drawn from those facts in light of experience." 612 F.Supp. at 1129); *Patchogue-Medford Congress of Teachers v. Bd. of Ed., supra; Caruso v. Ward, supra; Turner v. Fraternal Order of Police, supra.* The reasonable suspicion standard has been deemed satisfied where there is actual evidence of a trustworthy nature pointing toward drug use, or where an accident involving government property has occurred. *Div. 241 Amalgamated Transit (AFL–CIO) v. Suscy, supra; Mack v. United States, supra; Allen v. City of Marietta, supra.*

The government argues, however, that several factors render the reasonable suspicion standard inappropriate with respect to the plaintiffs in this case. First, the government points out that its program is less intrusive than many of those considered by the courts that have struck down random testing. The procedures in some of those cases involved direct obser-

lating such things as off-duty alcohol consumption or even sleeping habits in an effort to ensure that the employee works to his full capacity?

Comment, *Drug Testing in the Workplace: A Legislative Proposal to Protect Privacy,* 13 J.Legis. 269, 279 (1986).

**6.** The Court takes notice, however, that technology appears to be developing whereby past activity can be discerned even from this sort of evidence. Such technology, at a point in the near future, may prompt a reevaluation of the circumstances under which such evidence may be taken, and the purposes to which it may be put.

vation of an employee as he or she urinated. The army civilian testing program calls for only indirect monitoring of the employee, the latter being permitted to produce his urine sample behind a partition, while the person administering the test listens for the normal sounds of urination. Only if suspicion develops that the employee has tried to tamper with the sample by virtue of the absence of the appropriate sounds from behind the partition, or if the temperature of the sample given to the overseer does not seem appropriate, will direct observation be required. Thus, the government argues that its test is basically unintrusive. The government then lists the substantial interests sought to be protected through the testing of these plaintiffs. Citing the only case that has held, in any context, that mandatory urine testing absent individualized suspicion is permissible, *Shoemaker v. Handel, supra* (jockeys subject to random drug testing), the government states that "[t]he Army's interest in having drug-free employees in these positions is at least as great as the New Jersey Racing Commission's need for drug-free jockeys...." *Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for a Temporary Restraining Order, and in Support of Motion to Dismiss [Memo of Points and Authorities]* at 40. Thus, the government concludes that, because the intrusiveness of the test is minimal and the governmental interests supporting testing are of the utmost importance, the balance should be struck in the government's favor, and no reasonable suspicion should be required.

While it is true that courts have made reference to the intrusiveness of programs calling for direct observation of an employee while he or she urinates, pointing to the humiliation and embarrassment associated therewith, it is doubtful that a program not requiring direct observation goes very far toward minimizing the overall intrusion. For as mentioned, *supra*, § II.A.1, the very taking of the sample makes for a quite substantial intrusion that could not be negated even if an employee were allowed to produce his urine sample in the privacy of an executive washroom, with no observation whatsoever.[7] The intrusiveness of direct observation, moreover, has been used by the courts as one more factor militating against the procedures involved in the cited cases, but an indirect observation procedure has not yet been deemed by a court to be a factor *supporting* random urinalysis. One court has reviewed a procedure almost identical to the one under consideration and was in no way persuaded that the intrusion was minimal. *Nat'l Treasury Employees Union v. Von Raab, supra.*

As to the enigmatic case of *Shoemaker v. Handel*, it has been referred to but has been rejected or distinguished by all of the courts that have dealt with the mandatory drug testing of law enforcement personnel subsequent to the *Shoemaker* decision. *Shoemaker* held that the "administrative search exception" applied to employees voluntarily participating "in the heavily regulated horse-racing industry." 795 F.2d at 1142. A New York court, in determining that reasonable suspicion is required before New York City police officers may be subjected to mandatory urinalysis, made the following assessment of the *Shoemaker* district court opinion and of the decision's applicability outside of the "regulated industry" context: *"Shoemaker* ..., on close examination ... either [is] not applicable to

---

**7.** The Ninth Circuit Court of Appeals addressed a somewhat related issue:

> In concluding that [strip searches] did not violate the officers' fourth amendment rights, the district court overemphasized the reasonable manner in which the searches were conducted. Although reasonableness in the conduct of the search is a consideration, the fact that a strip search is conducted reasonably, without touching and outside the view of all persons other than the party performing the

> search, does not negate the fact that a strip search is a significant intrusion on the person searched. We conclude that strip searches of [sic] police investigative purposes are governed by the reasonable suspicion standard even when they are conducted in a courteous manner with the minimum invasion of privacy possible.

*Kirkpatrick v. City of Los Angeles*, 803 F.2d 485, 489 (9th Cir.1986) (citations omitted).

the facts in the instant proceeding, or is clearly distinguishable therefrom or [is] simply out of step with the rest of the authorities." *Caruso v. Ward, supra,* 506 N.Y.S.2d at 798. This seems an adequate assessment of the Circuit Court opinion as well. The facts of *Shoemaker* are distinguishable from the facts before the Court and, as the trend of recent cases indicates, the decision does not seem to be in keeping with the prevailing case law.

Most powerful of the government's arguments, of course, is that the duties and responsibilities of plaintiffs in this case cannot be compared with those of ordinary police officers. Many of the concerns raised by the government, for example, that testing in the absence of reasonable suspicion is required because even a hint of police corruption undermines confidence in law enforcement or because armed officers must be ready to make life or death decisions, have been found insufficient governmental interests in cases involving local law enforcement personnel, and do not militate any more strongly here in favor of testing absent individualized suspicion. *See Caruso v. Ward, supra; Turner v. Fraternal Order of Police, supra; Penny, et al. v. City of Chattanooga, supra.* Yet the government points to the presence of "dangerous government property and property relating to national security" at the Fort Stewart installation where the plaintiffs are employed. The government also has indicated that, while these plaintiffs usually carry only a .38 caliber pistol, "other weapons are available if necessary, such as in the case of a terrorist or other hostile attack." *Memo of Points and Authorities* at 37–38. These and similar concerns have some force.

Nevertheless, the Court questions whether these officers in fact have duties and responsibilities that are intimately or even regularly related to national security concerns, or they are simply police officers who happen to be employed at a federal installation. At present, the Court is of the opinion that the latter characterization is the more accurate. At the final hearing on the merits of this action, at which the

Court believes the plaintiffs are likely to prevail, the parties should be prepared to present evidence concerning the true nature of the day-to-day activity of the plaintiffs, the actual exposure of the plaintiffs to top-secret, classified, or sensitive information, and the ways in which the duties of these plaintiffs differ from or are comparable to those of a local police officer. In order for a search as intrusive as that proposed by the DoD and Department of the Army to pass constitutional muster, the duties of the employees who will be subjected to standardless testing must be shown to be more than remotely or conceivably related to national security, or the duties if performed under the influence of drugs must be shown to pose a potential danger to persons or property well beyond the danger inherent in ordinary police or transportation employment. *See Nat'l Treasury Employees Union v. Von Raab, supra* (customs officials may not be tested absent reasonable suspicion).

As a final note on the topic of "reasonableness," the Court addresses the government's adamant argument that drug use is "simply incompatible" with federal employment. The government has cited a great many cases supporting this position, and the Court does not take issue with it. The question here, however, is not *whether* drug use, off-duty or on-duty is incompatible with federal employment. Rather, the question is *by what means* is it permissible to come by evidence of such drug use. The growing of marijuana in an employee's basement would certainly not be appropriate, but surely the government cannot be heard to say that a warrantless search of all civilian employees' basements is permissible in order to find out who is growing marijuana. Similarly, the random search of civilian employees' urine, a bodily fluid generally retained for disposal when and where an individual chooses, is impermissible under any but the most urgent of circumstances. The much-quoted language of the district court in *McDonell v. Hunter* puts it best: "There is no doubt about it—searches and seizures can yield a

wealth of information useful to the searcher. (That is why King George III's men so frequently searched the colonists). That potential, however, does not make a governmental employer's search of an employee a constitutionally reasonable one." 612 F.Supp. at 1131. The drug problem in this country is real and it is dangerous. But the methods used to eradicate it must be implemented within constitutional limits, not only because the employees to be tested for drugs have an expectation of privacy, but also because the creation of unfortunate precedent in this area, especially in light of the technological advances of recent years, could and would have a far-reaching impact upon the rights of all citizens in areas outside of the drug context.

### 3. Government Employment Cannot be Conditioned Upon Waiver of a Constitutional Right

■ It is clear that the government may not require the relinquishment of an employee's fourth amendment rights as a condition of employment. Thus, if the seizure of the plaintiffs' urine, and the search thereof for evidence is found to be "unreasonable," then consent to such a search and seizure cannot be required. *See Caruso v. Ward, supra,* 506 N.Y.S.2d at 794–95 (citing cases). "Advance consent to future *unreasonable* searches is not a reasonable condition of employment." *McDonell v. Hunter, supra,* 612 F.Supp. at 1131 (emphasis in original).

■ Thus, that the plaintiffs here have signed DA Form 5019–R cannot be said to have effected a waiver of the plaintiffs' rights. Moreover, with respect to the "voluntary" nature of the consent given, it is clear that the signing of these forms was coerced. The affidavit of one of the plaintiffs indicates that his superior came to his home with a 5019–R form and, in response to this plaintiff's question whether it was necessary to read the form, the superior officer stated: "I don't give a s___ whether you read it or not, if you do not sign it you

will be fired." The government's argument that transfer, not termination, will result from a refusal to sign does not seem credible, in light of the terms of the form providing for transfer *or* demotion *or* "separation." Moreover, the Court questions, as do the plaintiffs, exactly how many "noncritical" positions exist to which trained police officers could be transferred. The Court finds that it is patently clear that the officers legitimately feared termination when they signed the forms. Thus, the consent was not voluntarily given, *see generally Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and would not be a valid condition of employment even if it were.

### 4. Government Employees Properly Enjoy Fourth Amendment Protection

■ Notwithstanding that the adversary system employed in this country's courts generally promotes the ends of justice, there are limits to the appropriateness of advancing certain arguments. That the Department of Justice should contend that the government is unduly limited by the fourth amendment in its employee relations is disturbing, and seems to this Court to be an entirely inappropriate and dangerous argument. Seizing upon dicta in the *Allen v. City of Marietta* decision,[8] the government maintains:

> [P]lacing Fourth Amendment restrictions on public employers not placed on private employers would make government service (at least relatively) a safe haven for drug use. While '[g]overnment employees do not surrender their fourth amendment rights,' their reasonable expectation of privacy vis-a-vis their employer is not different from that of employees in the private sector.

*Memo of Points and Authorities* at 28–29, citing *Allen v. Marietta, supra,* 601 F.Supp. at 491, (footnote omitted). The government then states that "[c]onditioning public employment on consent to a rea-

---

**8.** Allen upheld the drug testing of several employees who worked with or around high voltage wires, and who had been observed smoking marijuana both on and off the job by an informant.

sonable drug testing procedure simply puts public-sector employees on the same footing as private-sector employees, who are subject to employer searches." *Id.* at 29 n. 17.

 It is true that private-sector employees may be "forced to consent" to random urine testing without individualized suspicion as a condition of employment. The fourth amendment operates to restrain the freedom of only state actors, and thus the private-sector employee is protected only by statutory enactments or by the common law of torts. Great concern has been expressed with respect to the voluntariness of the consent to such invasions of privacy given by private-sector employees,[9] but the majority of legislatures and courts have not yet addressed the problem. *But see* San Francisco, Calif. Ordinance 527–85 (Dec. 2, 1985). The unfortunate fact of the matter is that private employers, in light of the current dearth of case law or legislative enactments in this area, can engage in activity that if conducted by the government would clearly violate the Constitution.[10] But it will be a dark day indeed when the United States government finds it appropriate to abandon the strictures of the Constitution in favor of a less burdensome "private-sector" set of rules that can allow for infringement of constitutional rights. The Court rejects the government's argument on this point, and sincere-

ly hopes that it will not be advanced in the future.

### B. The Inadequacy of the CSRA Framework

As noted, *supra,* the *NFFE* district court dismissed a similar action because of the availability of ex post facto judicial review of the procedures here at issue, and because of the perceived availability of an ex post facto *Bivens*-type action to individual employees not entitled to redress through the MSPB machinery. While the Court disagrees generally with the *NFFE* district court's conclusions on the exclusivity of CSRA remedies, it is the latter part of the court's decision, concerning the availability of a *Bivens*-type action that seems most open to question.

 The Army has presented no evidence whatsoever that there is a drug problem among the civilian police officers at Fort Stewart, and the plaintiffs have maintained that indeed no problem does exist. Therefore, it seems reasonable to conclude that the majority of any such employees tested for drug use will receive a negative test result. These employees will have no access to the MSPB. It is this majority of employees that is said to have an adequate remedy at law through a *Bivens*-type action. While it seems at least questionable whether a *Bivens* suit could be brought against officials administering a testing procedure such as the one under considera-

9. *See, e.g.,* Comment, *supra,* note 5 and authorities cited therein. This Comment points out that many state legislatures have enacted statutes prohibiting or limiting the mandatory subjection of employees to polygraph testing, *id.* at 277–78, an intrusion similar to drug testing, albeit less accurate.

10. The armed forces also may conduct searches of *military* personnel that would violate the constitutional rights of civilian personnel. *Comm. for GI Rights v. Callaway,* 518 F.2d 466 (D.C.Cir. 1975). Such searches are appropriate and necessary, for "no military organization can function without strict discipline and regulation that would be unacceptable in a civilian setting." *Chappell v. Wallace,* 462 U.S. 296, 300, 103 S.Ct. 2362, 2365, 76 L.Ed.2d 586 (1983). Thus, on one end of the spectrum are soldiers, who have no reasonable expectation to be free from ran-

dom drug searches. At the other end of the spectrum are private-sector employees who, while they have a legitimate and reasonable expectation to be free from such searches, have little means of redress for violations committed by their employers. In the center are civilian employees of the government, who in almost all cases will have a reasonable expectation to be free from intrusive random searches, and who are properly protected from such searches by the fourth amendment. The reasonableness of a search of a civilian government employee must be gauged by balancing intrusiveness against governmental need, taking care not to extend the logic of cases such as *Callaway* beyond reasonable limits, and never assuming that because a practice is not considered illegal in the private sector, it is therefore reasonable under the fourth amendment.

tion, if it is assumed that such an action could be brought it remains clear that the action would have little chance of success. It seems inconceivable to the Court that an action of this type could survive a motion for summary judgment on qualified immunity grounds, in light of the fact that these employees arguably lie on the borderline between those government workers who may be subjected to random testing (the military) and those who cannot (police and customs officers). If the testing is found to be unconstitutional, the officials administering or ordering the implementation of the test will surely be entitled to qualified immunity, because a tenable argument can be advanced that, at the time of the program's implementation, it was not clear that reasonable suspicion was required. *See generally Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Kirkpatrick v. City of Los Angeles, supra*, note 7 (9th Cir.1986).[11] The technical availability of an action through which no relief can be obtained hardly qualifies as a meaningful remedy. Moreover, whether the officers could sue the United States under the Federal Tort Claims Act for the actions of those implementing or administering the tests is doubtful. *See generally McCollum v. Bolger*, 794 F.2d 602 (11th Cir.1986); *Caban v. United States*, 728 F.2d 68 (2d Cir.1984).

Thus, if it is held that a determination of the constitutionality of the tests under consideration must wait—perhaps for a year or more—for an appeal from the FLRA to a Circuit Court of Appeals, or an appeal to the Federal Circuit from an adverse action taken by the MSPB, and if it is ultimately determined that the tests do violate the Constitution, then the majority of persons testing negative on these periodic drug tests and those against whom no adverse action is taken on the basis of a positive test will have *neither* immediate nor ex post facto relief. From this alone, it should be apparent that the CSRA frame-

work cannot adequately protect the plaintiffs in this case. Thus, *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), is distinguishable.

■ Even if access to the MSPB is made available to an individual plaintiff by virtue of an adverse action taken by the MSPB, or even if the constitutional rights of the plaintiffs here can be vindicated *in principle* by a Circuit Court opinion resulting from the appeal of an FLRA decision, the delay involved in any such vindication seems unconscionable. The court in *Nat'l Treasury Employees Union v. Von Raab, supra*, noted:

> Under the *NFFE* approach, the district court should decline to entertain complaints for injunctive relief to prevent a constitutional violation, but should exercise jurisdiction over certain claims seeking damages for the constitutional violations. This approach is irrational. Rather than forcing the plaintiffs to submit to an unconstitutional program then seek damages in court, this Court will exercise jurisdiction over the Petition for Declaratory and Injunctive Relief.

649 F.Supp. at 386. In the absence of Circuit Court authority clearly governing the facts of this case, the *NTEU* approach seems appropriate. Indeed, because the ex post facto judicial remedies available to these plaintiffs are in large part illusory, failure to exercise jurisdiction *now* would be inappropriate.

### C. *Injunctive Relief*

■ It is evident that the plaintiffs stand a very good chance of success on the merits: if they are indeed simply police officers employed by the federal government then the cases clearly prohibit drug testing of these plaintiffs absent reasonable suspicion. In addition, it is apparent that the harm that would be suffered in the absence of injunctive relief would be substantial for all plaintiffs and irreparable for

---

**11.** In *Kirkpatrick*, two officers were strip searched without reasonable suspicion. The court held that reasonable suspicion was required, but found that the individuals respon-

sible could not be held liable under 42 U.S.C. § 1983 because, at the time the search was conducted (1981), it was not an established matter of law that reasonable suspicion was required.

the great majority of them. Furthermore, the government has survived without a drug testing program with respect to such employees in the past and, in the absence of any evidence of a drug problem among these officers, it cannot be said that severe harm will be suffered by delaying implementation of the program until the constitutionality of the procedures, as applied to these plaintiffs, has been determined. Finally, the public interest is greatly served by a careful scrutiny of procedures that might threaten the constitutional rights of United States citizens.

Thus, the four-part equation for determining the appropriateness of injunctive relief has been satisfied. The Court might have been more hesitant to act six months ago. But recent decisions clearly indicate not only that police officers cannot be tested for drugs absent individualized suspicion, but also that the remedies available to these plaintiffs (should random testing of them be found unconstitutional) are woefully inadequate or in fact entirely illusory. *See generally Kirkpatrick v. City of Los Angeles, supra.* Preliminary injunctive relief shall therefore be afforded the plaintiffs here, with respect to the testing procedures being implemented at the Fort Stewart/Hunter Army Airfield military installation.

### D. *Comity*

■ It is in the interests of comity that the Court grants only local relief to these plaintiffs. Recognizing that its decision cannot help but infringe to some degree on the jurisdiction of the D.C. district court, the Court prefers to infringe as little as possible, while still protecting the constitutional rights of local plaintiffs. The Court is painfully aware that its decision will in all likelihood spawn a fair amount of litigation. To the extent that this will involve the expenditure of judicial resources, the Court believes that the circumstances, regrettably, warrant the careful scrutiny of the implementation of the DoD and Army civilian drug testing program. To the extent that the government will be forced to defend its program in numerous fora, the Court notes simply that the government could have avoided this predicament by agreeing to a stay pending a determination of the constitutionality of its program before an appropriate Circuit Court of Appeals.

The Court holds: where fundamental rights will likely be violated on a repeated basis absent injunctive relief, where the merits of a constitutional claim of the highest magnitude are not currently before any federal tribunal, where case law issuing from the federal and state courts in the months since the denial of preliminary injunctive relief by another federal court indicates that the "four part equation" used for determining the appropriateness of such relief has changed substantially in the plaintiffs' favor—under such circumstances surely comity does not call for dismissal. Surely also no tribunal could be offended by this Court's exercise of jurisdiction to enjoin conduct that could have the effect of permanently and *irreparably* infringing upon the constitutional rights of United States citizens.

### III. CONCLUSION

For the reasons stated, it is hereby ORDERED that the Department of the Army is PRELIMINARILY ENJOINED:

1) From implementing drug testing by urinalysis of any civilian police officer absent reasonable suspicion that the employee has engaged in drug use.

2) From taking any action, adverse or otherwise, against any such employee who has tested positive for drug use as a result of urinalysis conducted absent reasonable suspicion on or after November 26, 1986.

3) From distributing DA Form 5019-R, and from requiring such employees to sign this form as a condition of continued employment in their current positions.

This injunction shall apply only with respect to the Fort Stewart/Hunter Army Airfield military installation, and shall not apply to drug testing of employees where reasonable suspicion exists, or where accidents involving government property have occurred. The injunction shall remain in

effect until such time as a hearing can be held on the merits of the case. At that hearing, the parties should be prepared to present evidence as to the nature of the duties of the plaintiff officers. If, after having heard the parties' arguments, the Court is satisified that the duties of the officers are not qualitatively different from those of city policemen or customs officials, and if it is not shown that drug use by civilian Army policemen might reasonably be expected to compromise the national security, a permanent injunction shall issue at that time.

For the reasons stated, the defendants' motion to dismiss is DENIED and the plaintiff's request for injunctive relief is PRELIMINARILY GRANTED with respect to random drug testing at Fort Stewart/Hunter Army Airfield.

Believing that this Order has dealt with several issues of law as to which there is substantial ground for difference of opinion, the Court hereby certifies pursuant to 28 U.S.C. § 1292 its belief that an immediate appeal from the Order may materially advance the ultimate termination of the litigation.